292 F.3d 982
 Christine L. MILLER, Guardian Ad Litem; Tonnie Savage, Guardian Ad Litem, Plaintiffs-Appellees,
v.
Nancy GAMMIE; Fran Zito, Defendants-Appellants, and
Nevada Child and Family Services Department; Nevada Child Welfare Division; State of Nevada; Volunteers of America of Nevada, Defendants.
 No. 01-15491.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 2002.
 Filed June 6, 2002.
 
 Stephen D. Quinn, Deputy Attorney General, Carson City, NV, argued the cause for the defendants-appellants. Frankie Sue Del Papa, Attorney General, and Charles Hilsabeck, Deputy Attorney General, were on the briefs.
 Monique Laxalt, Reno, NV, argued the cause for plaintiff-appellee Tonnie Savage. Sean P. Rose was on the briefs.
 Appeal from the United States District Court for the District of Nevada; Howard D. McKibben, Chief District Judge, Presiding. D.C. No. CV-99-00275-HDM(PHA).
 Before: O'SCANNLAIN and TALLMAN, Circuit Judges, and KING*, District Judge.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We must decide whether state child services workers involved in ongoing state court dependency proceedings enjoy absolute immunity for the placement of a child in a foster home.
 
 
 2
 * This case arises out of the sexual assault of Joe Roe, a minor, by Earl Doe, also a minor. At the time of the assault Earl was a ward of the State of Nevada placed in the foster home of Joe's parents, John and Jane Roe.[1] This suit is maintained on behalf of Earl by Tonnie Savage, his guardian ad litem.[2]
 
 
 3
 * In late December, 1996, the Nevada Division of Child and Family Services (DCFS) removed Earl, age 12, and his older brother from their home for their protection and placed them in an emergency foster care facility.[3] Nancy Gammie, a DCFS social worker, was responsible for Earl's case as well as those of his brother and sister. Fran Zito, a DCFS social therapist, provided therapy to Earl. Soon after removing Earl and his brother from their home, DCFS petitioned the Nevada Juvenile Court to declare Earl a ward of the State and to grant DCFS custody. The juvenile court approved the removal and placed Earl into the custody of DCFS.
 
 
 4
 At some point in January, 1997, both Earl and his brother were moved from the emergency facility to a foster home, where they lived together. Later that month, Gammie filed a Nevada Chapter 432B protective proceeding petition[4] with the Juvenile Court asking the court to find Earl and his brother to be in need of protection and to continue their custody in the DCFS. The petition set forth that Earl had an extensive history of sexual abuse. Toward the end of the month Gammie filed an initial report providing further details of Earl's history of sexual abuse, and informed the court that Earl was in foster care. On February 3, the court declared Earl to be in danger, made him a ward of the State, gave custody to DCFS, and approved Gammie's plan for foster home placement. The court also ordered six-month periodic reviews.
 
 
 5
 In March, DCFS removed Earl's brother from the foster home based on allegations that he engaged in inappropriate sexual conduct with a young boy. Earl was also removed from the foster home in April; he was thereafter placed in a Volunteers of America (VOA) emergency shelter.
 
 
 6
 In her six-month report to the Juvenile Court filed in July, Gammie elaborated on the extent of Earl's sexual abuse history. She also informed the court of Earl's placement at the time and indicated that Earl would "be moving into a more homelike setting within the next few weeks." After studying the report, the Juvenile Court approved its recommendations.
 
 B
 
 7
 Sometime in 1997, the Roes applied to VOA to become foster parents. At that time the Roes already had two young children of their own — a son, Joe, age 9, and a daughter, age 12. The application was accepted and, on December 2, 1997, Earl was placed into the Roes' home as a foster child. The very next day, December 3, Gammie submitted her second six-month report to the Juvenile Court. In that document, she reported Earl's placement in the Roes' home — although she did not mention that the Roes had young children. She also noted that Earl still "need[ed] a great deal of therapy" to deal with his past sexual abuse "and to reach the point of being safe with other children." On December 29, the court approved the placement decision.
 
 
 8
 Zito worked with Earl during his placement with the Roes. During one of their sessions together, it came out that Earl had been sexually abused and had sexually abused others.[5] Jane Roe asked Zito if it was safe for Earl to remain in the Roes' home with their natural children; Zito assured her that there was nothing to worry about.
 
 
 9
 Earl's placement with the Roes was a disaster. After about two months had elapsed, in February 11, 1998, Joe Roe discreetly told his sister that Earl had molested him on a prior night. The sister told Mr. and Mrs. Roe of her conversation with Joe, and Joe himself eventually informed his parents that Earl had molested him. On February 13, 1998, Earl was arrested and admitted to sodomizing Joe between three and five times.
 
 C
 
 10
 On June 16, 1999, Tonnie Savage, as guardian ad litem for Earl Doe, commenced an action for redress of civil rights violations in the Second Judicial District Court of the State of Nevada, in and for the County of Washoe. The complaint contained various claims under 42 U.S.C. § 1983 for alleged constitutional violations in connection with Earl's placement in the Roe home, and also various state law claims. It named as defendants DCFS, Gammie, Zito, and VOA. The defendants removed the action to the United States District Court for the District of Nevada.
 
 
 11
 DCFS, Gammie, and Zito moved for dismissal on the pleadings.[6] After argument, the district court dismissed the claims against DCFS, and also the claims against Gammie and Zito in their official capacities, based on the Eleventh Amendment. The court also remanded the state law claims to state court.[7] The court declined to rule, however, on the motion in so far as it requested dismissal of the claims against Gammie and Zito in their individual capacities based on absolute immunity. At oral argument, the court seemed troubled by allegations that Zito and Gammie had failed to comply with a Nevada statute requiring social workers to inform foster parents of any history of behavioral problems experienced by a foster child before placement in a foster home.[8] The court ruled:
 
 
 12
 I'm granting leave to raise [the absolute immunity defense] at the completion of the discovery limited to those issues, because there was an issue raised today that I think merits some additional consideration, and that's on the notice. But I'm not satisfied, necessarily, that that's going to preclude that defense, but I want more information presented to me on that. I don't think there was enough submitted.
 
 
 13
 Counsel for Zito and Gammie then indicated that, based on that ruling, he would appeal the denial of absolute immunity immediately. The court then retrenched, responding,
 
 
 14
 Why don't you do this. Vacate my order on the motion that's pending. I'm not going to deny that motion, but I will compel discovery ... on all of the issues that relate to absolute immunity.... But there will be no order granting or denying that motion at this point, and then you have nothing to appeal.
 
 
 15
 By a subsequent order, the court lifted a stay of discovery that it had previously imposed and granted discovery limited to "the issue of absolute immunity under the § 1983 claim as to individual liability, which discovery shall be completed within one hundred and twenty days from this date." Zito and Gammie timely appealed the district court's order.
 
 II
 
 16
 Before addressing the merits we must deal with a threshold jurisdictional issue. By motion appellee Savage has asked us to dismiss this appeal for lack of jurisdiction. The parties agree that this court has jurisdiction, if at all, pursuant to the collateral order doctrine.
 
 
 17
 * The collateral order doctrine, of course, stems from the Supreme Court's decision in Cohen v. Beneficial Industries Corporation, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In Cohen, the Supreme Court recognized that under 28 U.S.C. § 1291 the courts of appeals have jurisdiction only over "final" orders of the district courts. As the Court explained, "[t]he effect of the statute is to disallow appeal from any decision which is tentative, informal or incomplete. Appeal gives the upper court a power of review, not one of intervention. So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal." Id. at 546, 69 S.Ct. 1221.
 
 
 18
 Nonetheless, the Court recognized that there is a small class of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Id. The Court held that such orders, termed collateral orders, are immediately appealable. Id. As we recently reaffirmed, an order must satisfy three requirements to qualify as a collateral order: (1) it must be conclusive; (2) it must resolve an important question separate from the merits; and (3) it must be effectively unreviewable on appeal from a final judgement. See Osband v. Woodford, 290 F.3d 1036, 1038-39 (9th Cir.2002) (quoting Wharton v. Calderon, 127 F.3d 1201, 1203 (9th Cir.1997)).
 
 B
 
 19
 The Supreme Court has repeatedly concluded that orders denying absolute immunity are reviewable on interlocutory appeal under the collateral order doctrine. See, e.g., Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (concluding that appellate jurisdiction over denial of President's claim to absolute immunity was proper); Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (reviewing claim of immunity under Speech or Debate Clause); see also Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir.1999) (concluding that the denial of a claim of absolute immunity raised in a 12(b)(6) motion to dismiss "is immediately appealable under the collateral order doctrine"). Thus, had the district court held fast to its original order denying the motion to dismiss based on absolute immunity, there is no question that we would have jurisdiction. But it did not; instead, it vacated its initial order and then expressly declined to rule on the motion. It concluded that, because there was "no order granting or denying that motion," the appellants would "have nothing to appeal."
 
 
 20
 We disagree. A litigant claiming official immunity is entitled to a judgment on whether the defense is appropriate at each step of the litigation, including both the motion to dismiss stage, and the summary judgment stage. By way of analogy to qualified immunity cases, if the district court had denied the motion to dismiss on absolute immunity grounds and this court affirmed, a motion for summary judgment on immunity grounds could nonetheless be brought, and appeal taken again if the district court denied that motion. See, e.g., Marks v. Clarke, 102 F.3d 1012, 1017 n. 8 (9th Cir.1997) (recognizing that in Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), the Supreme Court "held that a defendant may appeal both the district court's denial of a motion to dismiss on the basis of qualified immunity and a subsequent denial of summary judgment on the basis of such immunity").
 
 
 21
 Of course, in this case the district court did not actually deny the motion to dismiss, but instead deferred ruling on the motion and lifted its discovery stay, permitting discovery on the issue of absolute immunity. But we see this as a distinction without a difference. As the Supreme Court has explained, absolute immunity creates not only protection from liability, but also the right not to have to answer for one's actions at all. See Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (explaining that "the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action"). A litigant is therefore entitled to a ruling on a motion to dismiss on the pleadings based on official immunity before the commencement of discovery. Id. at 526, 105 S.Ct. 2806 (recognizing that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery").[9] We conclude that the district court's ruling deferring decision on the motion to dismiss and lifting the stay of discovery was tantamount to a denial of the motion. Accordingly, lest form be exalted over substance, we hold that the district court's order is sufficient to support our jurisdiction over this appeal. See also Lollar v. Baker, 196 F.3d 603, 606 n. 3 (5th Cir.1999) (concluding, where the district court declined to rule on a motion to dismiss based on qualified immunity and instead ordered discovery limited to issues relating to that defense, that "the grant of a plaintiff's discovery request in such a circumstance constitutes a denial of the defendant's claim of qualified immunity from which the defendant is entitled to an immediate appeal").
 
 III
 
 22
 We now proceed to the merits. The complaint alleges that Nevada child service workers Gammie and Zito violated Earl's constitutional rights by intentionally failing to disclose, by misrepresenting, and by concealing, his prior history of sexual abuse in connection with his placement in the Roes' home. Taking all allegations in the complaint as true and construing them in the light most favorable to Savage, see Meek, 183 F.3d at 965, we must decide whether Zito and Gammie are entitled to absolute immunity.
 
 
 23
 * Babcock v. Tyler, 884 F.2d 497 (9th Cir.1989), sets forth this Circuit's law on absolute immunity for state workers involved in child welfare proceedings; it merits discussion at some length. In Babcock, a Louisiana court issued an order of dependence mandating the removal of four children from the care of their father, Rudolph Babcock, after their mother, Ann Long Babcock, committed suicide. Ann was the mother of all four children, all of whom were girls; two (the "Babcock girls") were Rudolph Babcock's daughters, and two (the "Long girls") were Ann's from a previous marriage. The Louisiana court placed all four girls with Rudolph's parents in Richland, Washington, and ordered Rudolph to live apart from the girls. It then relinquished jurisdiction over the case on condition that Washington accept jurisdiction. Thereafter, the Washington Department of Social and Health Services (DSHS) workers sought and obtained an order from the Washington Juvenile Court by which Washington accepted jurisdiction. Id. at 498-99.
 
 
 24
 Following Washington's acceptance of jurisdiction, the Juvenile Court held a dependency hearing. Rudolph obtained a continuance of the hearing as to the Babcock girls. The court entered a "temporary order" placing the Long girls in the home of Lee and Janet Michael.[10] After Rudolph tried to remove the Babcock girls to Wisconsin, only to have his efforts thwarted by a Wisconsin court which remanded the Babcock girls to the custody of the DSHS, Washington case-worker Mark Bronson — acting without a court order — placed the Babcock girls with the Long girls in the Michaels' home. In a subsequent hearing, held within three weeks of that placement, DSHS worker Wanda Tyler recommended to the Juvenile Court that all four girls remain with the Michaels. Pending a continuance, the court determined that the girls should remain with the Michaels. Id. at 499.
 
 
 25
 The girls remained in the Michaels' home for approximately a year and a half until it was discovered that Lee Michael had sexually abused all four — plus his own daughter. Thereafter Rudolph, on behalf of himself, the two Babcock girls, and one of the Long girls, sued DSHS caseworkers Tyler and Bronson under 42 U.S.C. § 1983 alleging, inter alia, "violation of the children's fourteenth amendment liberty interests in being free from harm while in the state's custody." Id. at 500.
 
 
 26
 The caseworkers moved for summary judgment claiming absolute immunity, the district court denied their motion, and they appealed. After determining that jurisdiction was proper under the collateral order doctrine, id. at 500-01, we addressed the merits of the absolute immunity defense. We began by noting that
 
 
 27
 the crucial inquiry in resolving a claim of absolute immunity is whether the function for which immunity is claimed is so much an integral part of the judicial process that to deny immunity would disserve the broader public interest in having participants such as judges, advocates and witnesses perform their respective functions without fear of having to defend their actions in a civil lawsuit.
 
 
 28
 Id. at 502. Under this rationale, we explained, "we have extended absolute prosecutorial immunity to social service caseworkers in initiating and pursuing child dependency proceedings, and in seeking and obtaining a court order for the seizure and placement of a newborn child[.]" Id. (citations omitted). "We have also held that a child protective services worker who executes a court order for seizure and placement of a child is entitled to absolute quasi-judicial immunity." Id.
 
 
 29
 We then addressed the plaintiffs' contention that the caseworkers' actions, which were not in pursuance of an initial dependency order, were not protected because they were "`purely administrative or ministerial' acts performed ... in connection with the supervision and placement of the children," and "such activity is not protected by absolute immunity." Id. at 502-03. We disagreed. "Dependency proceedings," we explained, "include post-adjudication activities as well as acts by which the proceedings are initiated." Id. at 503.
 
 
 30
 Throughout this [dependency] process, caseworkers need to exercise independent judgment in fulfilling their post-adjudication duties. The fear of financially devastating litigation would compromise caseworkers' judgment during this phase of the proceedings and would deprive the court of information it needs to make an informed decision. There is little sense in granting immunity up through adjudication of dependency, and then exposing caseworkers to liability for services performed in monitoring child placement and custody decisions pursuant to court orders.
 
 
 31
 Id. (citations omitted). Accordingly, we concluded that because "all of Tyler's and Bronson's actions of which the plaintiffs complain were taken in connection with, and incident to, ongoing child dependency proceedings," the two were "entitled to absolute immunity." Id. (emphasis added).
 
 B
 
 32
 Like the claims in Babcock, the claims in this case arise out of Gammie's and Zito's actions in connection with, and incident to, ongoing child dependency proceedings. Here, Earl was declared a ward of the State in a dependency proceeding in February, 1997, and placed in the custody of DCFS. Thereafter, Gammie supervised all of his placements — including his placement in the Roes' home. Gammie continually informed the Nevada Juvenile Court of Earl's situation and his placements, and the court routinely approved. The claims against Gammie in the complaint at issue all allege misconduct (failure to disclose, concealment of, or misrepresentation of Earl's sexual abuse history) in connection with Earl's placement with the Roes. Accordingly, they are barred by absolute immunity.
 
 
 33
 The claims against Zito, too, are barred. Although it is not clear from the record that she had any involvement at all with Earl's placement in the Roe home, regardless, she, no less than Gammie, is entitled to absolute immunity. For as we said in Babcock, "[a]bsolute immunity from liability under 42 U.S.C. § 1983 has been accorded" not only to "state employees responsible for the prosecution of child neglect and delinquency petitions, [and] the guardian ad litem who serves as an advocate for the children in such proceedings," but also to "psychologists and psychiatrists who provide information and findings for use in the proceedings by the State Department of Social Services." 884 F.2d at 501-02.
 
 
 34
 Savage nonetheless maintains that Gammie's actions are not protected under Babcock because she placed Earl in the Roes' home before there was any court order authorizing that placement. It is true that the placement occurred first, and was followed nearly one month later by a court order approving the placement. But Babcock forecloses Savage's contention. In Babcock, Rudolph challenged two temporary placements of the children without a court order. Id. at 503-04. One of these included Bronson's earlier placement of the Babcock girls in the Michaels' home without a court order. We concluded, however, that "[t]hese two instances of placement ... [did] not affect the result" in the case, id. because they "did not result in any harm during the period of that temporary placement; the sexual abuse occurred after the Washington juvenile court made its order ... confirming Bronson's placement of the children with the Michaels." Id. at 504. Likewise, in this case, nothing in the record indicates that Earl molested Joe Roe between the time of his initial placement in the Roe home in December, 1997 and the court's confirmation of that placement later that month.
 
 
 35
 Nor do Savage's allegations of intentional misconduct distinguish this case from Babcock. In Babcock, among other things, Rudolph alleged that absolute immunity was improper because DSHS worker Tyler "conspired with Lee Michael to skew the DSHS recommendation in favor of the Michaels and to obtain a court order placing the children in the Michaels' home." Id. at 503. And we made clear that "[a] social case-worker's entitlement to the defense of absolute immunity in the performance of her duties incident to child dependency proceedings cannot be defeated by allegations that the case-worker conspired with one of the parties to affect the outcome of the case." Id. Thus, under Babcock, even claims of intentional wrongdoing against social workers are barred, to the extent that they allege intentional wrongdoing "in connection with, and incident to, ongoing child dependency proceedings." Id.
 
 
 36
 Savage also contends that even if Babcock applies, "Gammie's and Zito's failure to disclose Earl's history was not [']pursuant to['] a court order," even if the placement of Earl in the Roes' home was. The flaw in this argument is as follows: it is not the simple failure to disclose that forms the basis of the complaint, but the failure to disclose when placing Earl in the Roe home. And because the placement at issue took place "in connection with, and incident to, ongoing child dependency proceedings," the alleged misconduct in connection with that placement also occurred in connection with, and incident to, ongoing child dependency proceedings.[11] Id.
 
 C
 
 37
 One certainly cannot condone the actions of the child services workers alleged in this case. The allegations in the complaint, whose truth we must assume at this stage, paint a sordid picture of dereliction of duty. Indeed, we are profoundly disturbed that persons acting in the name of the State of Nevada would place a known sexual predator into a home with two small children — without even informing the parents of his dangerous tendencies. More specifically, with respect to the action before us, we are troubled that these state workers would put a child with Earl's history and proclivities into such an inherently tempting and dangerous situation. This strikes us as akin to putting an oil lamp in a dynamite bunker; the placement itself turns something that could be productive and appreciated in any of a number of settings into nearly certain calamity and pain.
 
 
 38
 On the other hand, as we recognized in Babcock, while absolute immunity "does leave the genuinely wronged defendant without civil redress," the alternative of affording only qualified immunity to child services workers "would disserve the broader public interest," as it would prevent the "vigorous and fearless" performance of their duties in child dependency proceedings. Id. (quoting Imbler v. Pachtman, 424 U.S. 409, 427-28, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)); see also 63C Am. Jur.2d, Public Officers and Employees § 318 (2d ed.1997) (explaining that "mere qualified immunity is not enough protection to prevent the chilling effect of a potential suit on the exercise of a social worker's professional judgment and discretion in operating as an arm of the Probate Court to protect abused children"). And it is for precisely those reasons that absolute immunity protects the unworthy as well as the worthy. Cf. Kalina v. Fletcher, 522 U.S. 118, 127, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997) (recognizing that absolute judicial immunity "is not grounded in any special esteem for those who perform [judicial] functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself") (internal quotation marks omitted).
 
 
 39
 Our consternation is also somewhat mollified by the knowledge that § 1983 claims barred by absolute immunity may find resolution by other means. For example, the opportunity for subsequent judicial review of decisions made by child services workers, and for subsequent appellate review of lower court decisions, provides a check upon actions clothed with absolute immunity. See, e.g., Nation v. Colla, 173 Ariz. 245, 841 P.2d 1370, 1377 (1992) (following the Ninth Circuit's cases culminating in Babcock: "We recognize that there may be cases where the dependency process could be abused. However, the opportunity for abuse is lessened considerably when judicial proceedings have commenced and there is an impartial decisionmaker participating"). Further, the grant of absolute immunity does not insulate an official from the criminal process or professional discipline. Imbler, 424 U.S. at 429, 96 S.Ct. 984. And, depending where a case arises, state-law claims may be available if the state does not afford absolute immunity for the challenged acts. See, e.g., Babcock v. State, 116 Wash.2d 596, 809 P.2d 143 (1991) (en banc) (denying absolute immunity under state law for the same acts afforded absolute immunity from § 1983 claims by this Court's decision in Babcock).
 
 
 40
 In any event, because we believe that this case is factually indistinguishable from Babcock, that decision controls. See In re Complaint of Ross Island Sand & Gravel, 226 F.3d 1015, 1018 (9th Cir.2000) (per curiam) ("A three judge panel of this court cannot overrule a prior decision of this court."). We therefore conclude, as we must, that "[w]hether their immunity is characterized as quasi-prosecutorial or as quasijudicial," because Gammie's and Zito's challenged activities "were taken in connection with, and incident to, ongoing child dependency proceedings[,]" they "are entitled to absolute immunity." Babcock, 884 F.2d at 503.
 
 IV
 
 41
 For the foregoing reasons, the district court's order lifting the discovery stay in this case is vacated. We remand for further proceedings not inconsistent with this opinion.
 
 
 42
 VACATED and REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 For purposes of clarity, the biologically related members of the foster family have been re-named "Roe," while Earl, the foster child placed in their home, retains the name "Doe."
 
 
 [2]
 This suit was consolidated in the district court with a similar suit involving claims by Christine Miller (as guardian ad litem for Joe Roe) and John and Jane Roe against the same defendants named in this suit. The Miller case has since settled, leaving only the Savage appeal before us
 
 
 [3]
 The boys' younger sister had previously been placed in a therapeutic foster home as a result of her sexually exhibitive behavior
 
 
 [4]
 See generally Nev.Rev.Stat. tit. 18, ch. 432B (Protection of Children from Abuse and Neglect).
 
 
 [5]
 The Roes avow that this was the first they had heard of these facts
 
 
 [6]
 VOA settled out of this case in June, 2000
 
 
 [7]
 These rulings have not been appealed
 
 
 [8]
 See Nev.Rev.Stat. § 424.038(1). That provision requires that
 [b]efore placing, and during the placement of, a child in a family foster home, the licensing authority shall provide to the provider of family foster care such information relating to the child as is necessary to ensure the health and safety of the child and the other residents of the family foster home. This information must include the medical history and previous behavior of the child to the extent that such information is available.
 Id. At oral argument, counsel for the state maintained that for purposes of this statute the "provider" was VOA, not the foster family. Counsel insisted that VOA had failed to pass on the required information to the foster family.
 
 
 [9]
 Of course, the district court did not need to permitdiscovery to rule on such a motion; it needed only to look at the complaint, assume all facts pleaded therein to be true, and answer the legal question of whether immunity applies. Cf. Meek, 183 F.3d at 965 (explaining that "[o]n review" of a district court's ruling on a motion to dismiss based on official immunity, "the facts alleged in the complaint are assumed to be true and are construed in the light most favorable to the plaintiff"). By the same token, in order to analyze materials produced by the discovery it ordered, the district court would have needed to convert the Rule 12(b)(6) motion to dismiss into a Rule 56 summary judgment motion. See In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir.1996), rev'd on other grounds sub nom. Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). And of course, if the court believed that dismissal were appropriate, it could not reach the summary judgment question. See Morley v. Walker, 175 F.3d 756, 761 (9th Cir.1999) (explaining that in ruling on a 12(b)(6) motion, a court "must regard all of the allegations in [the] complaint as true"; if "[t]hrough that lens, the complaint withstands a motion to dismiss," then "[o]n summary judgment, those allegations must be supported"; finally, if at summary judgement "the facts are genuinely in dispute, there must be a trial").
 
 
 [10]
 Janet was the sister of the girls' natural mother, Ann Long Babcock
 
 
 [11]
 In a similar vein, it also does not matter whether, as Savage contends, this alleged non-disclosure violated a state statute. For absolute immunity is immunity from charges of either "constitutionalor statutory violations." Mishler v. Clift, 191 F.3d 998, 1002 (9th Cir.1999) (citing Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)) (emphasis added).