Henry H. CUNNINGHAM, Plaintiff,

v.

CITY OF WENATCHEE; Chelan County; Barker & Howard, P.S.; Robert R. Perez and Jane Doe Perez, and the marital community composed thereof; Dean Reiman; Kenneth Badgley and Jane Doe Badgley, and the marital community composed thereof; Jeffrey C. Barker and Debra L. Barker, and the marital community formerly composed thereof; Rebecca Carroll and John Doe Carroll, and the marital community composed thereof, Defendants.

No. CS–01–0058–WFN.

United States District Court, E.D. Washington.

July 10, 2002.

Michael David Pierson, Gavin W. Skok, Riddell Williams PS, Seattle, WA, David D. Hoff, Topusley Brain Stephens, PLLC, Seattle, WA, Glenn S. Draper, Law Office of Glenn S. Draper, Seattle, WA, Aryeh Y. Brown, Law Office of Ari Brown, Seattle, WA, for Henry H. Cunningham.

Patrick G. McMahon, Carlson McMahon & Sealby PLLC, Wenatchee, WA, for City of Wenatchee.

John Francis Kennedy, Law Office of John Francis Kennedy, Gig Harbor, WA, for Chelan County, Alicia Nakata, John Doe Nakata.

Joel E. Wright Jennifer M. Ilenstine, Lee Smart Cook Martin & Patterson PS, Seattle, WA, for Barker & Howard, PS, Jeffrey C. Barker, Rebecca Carroll, John Doe Carroll.

Lee V. Cockrum, Ogden Murphy Wallace, Seattle, WA, Ray P. Cox, Forsberg & Umlauf, PS, Seattle, WA, Patrick G. McMahon, Carlson McMahon & Sealby, PLLC, Wenatchee, WA, for Robert R. Perez.

Ray P. Cox, Forsberg & Umlauf, PS, Seattle, WA, Patrick G. McMahon, Carlson McMahon & Sealby, PLLC, Wenatchee, WA, James Everette Macpherson, Kopta & Macpherson, Bainbridge Island, WA, for Jane Doe Perez.

Jeffrey A. O. Freimund, Atty. Gen. of Washington, Tort Claims Div., Olympia, WA, for Dean Reiman.

Patrick G. McMahon, Carlson McMahon & Sealby, PLLC, Wenatchee, WA, for Kenneth Badgley, Jane Doe Badgley.

## ORDER

WM. FREMMING NIELSEN, District Judge.

On June 19, 2002, the Court heard oral argument on Defendant Dean Reiman's Motion for Summary Judgment. Glenn Draper participated on behalf of Plaintiff; Jeffrey Freimund participated on behalf of Defendant Reiman; Patrick McMahon participated telephonically on behalf of Defendants City of Wenatchee, Robert Perez, and Kenneth and Jane Doe Badgley; James Macpherson participated telephonically on behalf of Defendant Luci Perez; Linda Choy participated telephonically on behalf of Defendant Chelan County; and Jennifer Ilenstine participated telephonically on behalf of Defendants Jeffrey and Debra Barker, Rebecca and John Doe Carroll, and Barker & Howard, P.S. The Court took the matter under advisement. For the reasons discussed below, the Court grants the Motion for Summary Judgment.

### I. BACKGROUND

Plaintiff filed this civil rights lawsuit against Defendant Dean Reiman, as well as the City of Wenatchee, Chelan County, Barker & Howard, P.S., and various other persons who were involved in the investigation, prosecution, conviction and representation of Plaintiff for alleged child sex abuse. Plaintiff alleged causes of action for civil rights violations and conspiracy to violate civil rights under 42 U.S.C. § 1983, as well as state law claims for negligence, breach of contract, professional negligence, false arrest, malicious prosecution, interference with custodial relations, negligent infliction of emotional distress, and outrage. Plaintiff seeks damages in excess of $10 million, plus punitive damages, attorney's fees, and costs.

## II. FACTS

The following facts are taken from the parties' Statements of Material Facts, submitted with briefing on the pending Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1. The Court deems admitted any fact asserted by a party and not rebutted by the opposing party. The parties do not dispute any of the facts recited in this section, except where otherwise noted.

1. In the late spring of 1994, Henry and Connie Cunningham lived at home in Wenatchee, Washington, with three of their four daughters: Jennifer, then 19, Sarah, then 17, and Jessica,[1] then 15. Their oldest daughter, Carrie, then 21, had moved out to go to college.

2. Plaintiff Cunningham suffered from bipolar disorder.

3. In May, 1994, Plaintiff Cunningham and his then wife, Connie Cunningham, decided to hospitalize their youngest daughter, Jessica, in a psychiatric facility in Idaho (known as Pinecrest Hospital). Jessica had behavioral and drug problems, was depressed, suicidal, and wanted to run away from home.

4. At Pinecrest, Jessica claimed that she had "remembered" that her father sexually abused her on multiple occasions when she was five years old in Moses Lake. A Pinecrest therapist, Sherry Speare, contacted the Washington State Department of Social and Health Services [DSHS], Child Protective Services [CPS] office in Wenatchee, Washington, where the Cunninghams resided, to report Jessica Cunningham's claim of sexual abuse. Because this initial referral from Pinecrest described abuse occurring only in the Mo-

ses Lake area, Wenatchee CPS forwarded the referral to the CPS office in the Moses Lake area for investigation, as well as to the local police in Moses Lake, with a courtesy copy sent to the Wenatchee Police Department.

5. Ms. Speare also reported to CPS on May 27, 1994, that Jessica Cunningham's mother, Connie Cunningham, was aware of Jessica's disclosure, but Plaintiff was not.

6. No one employed by the State of Washington, including Defendant Reiman, was present or involved when Jessica made her initial disclosure of sexual abuse at Pinecrest.

7. In late May or early June of 1994 (sometime between Jessica's conversation with Ms. Speare on May 27, 1994, and June 3, 1994), Connie Cunningham advised Plaintiff, through a mutual friend, Carol Doggett, that she was going to divorce him.

8. At some time prior to June 3, 1994, two of Plaintiff's other daughters who resided in the family home, Sarah and Jennifer, made hostile overtures to Plaintiff.

9. Also during the week before June 3, 1994, Sarah and Jennifer Cunningham told the Plaintiff that they were going to move out of the family home.

10. On June 1, 1994, CPS received a second referral from Pinecrest Hospital, with further allegations of Plaintiff's sexual abuse of Jessica, and related concerns that Jessica's sisters also may have been abused by Plaintiff.

11. Plaintiff testified that he first learned of his daughter Jessica's allegation of sexual abuse on June 1 or June 2, 1994.

12. On June 3, 1994, upon the recommendation of his psychiatrist, Plaintiff

---

**1.** Jessica Cunningham is also referred to as "Jessika Still" in some of the supporting ma- terials.

drove to the Wenatchee Police Department, where he asked to speak with Detective Robert Perez. Plaintiff met with Defendant Detective Perez for eight hours. During Plaintiff's discussion with Defendant Detective Perez on June 3, 1994, Plaintiff made a detailed statement wherein he admitted to sexually abusing his daughter Jessica in Moses Lake and in Wenatchee, as well as sexually abusing his three other daughters, Sarah, Jennifer, and Carrie in Wenatchee and elsewhere. A written statement was prepared while the Plaintiff was present and signed by Plaintiff on each of the four and one-half pages.

13. No one employed by the State of Washington, including Defendant Reiman, was present or involved at the time the statement was obtained.

14. In a deposition in a related case, Sergeant Terry Pippen testified that he and Officer Tangen, went to Plaintiff Cunningham's home, where they spoke with Jennifer Cunningham and Sarah Cunningham. The officers told the girls their father had just admitted to raping them. Both girls denied any memory of being sexually abused. Sergeant Pippen did not attempt to obtain any physical evidence, despite Defendant Detective Perez's statement that one of the girls was raped approximately 18 hours earlier. According to Sgt. Pippen, the policy of the Wenatchee Police Department was to obtain a rape kit to search for physical evidence likely to exist. Neither officer retained any notes or prepared a report documenting their interviews.

15. On June 6, 1994, after Plaintiff made and signed the statement, and following his arrest and incarceration on June 3, 1994, Defendant Reiman was assigned to conduct a CPS investigation of the sexual abuse allegations. Prior to June 6, 1994, Defendant Reiman had no involvement with any member of the Cunningham family.

16. Defendant Reiman recorded his activities in the Cunningham case in an Action Log Report. There is no reference in the Action Log Report to any alleged statement by Sarah Cunningham on June 2, 1994.

17. On June 6, 1994, Defendant Reiman met with Defendant Detective Perez and obtained his police report, including Plaintiff's statement. That same day, Defendant Reiman also met with Connie Cunningham at the police department, who told Defendant Reiman that she was going to divorce Plaintiff and, although she had been unaware of her husband's sexual abuse of their daughters, "looking back can see some indicators."

18. On June 6, 1994, Defendant Reiman interviewed Jennifer Cunningham at the Wenatchee Police Department. Jennifer denied any memory of abuse by her father. Defendant Reiman's notes reflect that certain things described by Jennifer's sister, Sarah, "about her rape on June 2, caused her to remember similar words and actions of her father's, but she couldn't remember any specific acts." His notes also reflect that "Det. Perez read to her the statements made by her father including a description of intercourse with her that occurred 2 or 3 weeks ago but she still claimed not to remember any specific episodes."

19. Since Jennifer was an adult, Defendant Reiman did not consider her to be a CPS client, and did not participate in the interview, and left before the police interview was completed.

20. On June 8, 1994, a Chelan County prosecutor, Alicia Nakata, filed an affidavit of probable cause.

21. There is no evidence that either the police or prosecutors were relying on any-

one from CPS, including Defendant Reiman, in making the initial arrest and charging decisions as well as determinations of probable cause.

22. On June 9, 1994, Defendant Reiman and Defendant Detective Perez traveled to Pinecrest Hospital to interview Jessica Cunningham.

23. Jessica Cunningham testified that: (a) she was told to go to Sheri Speare's office where she met with Defendant Detective Perez and Defendant Reiman; (b) there was nobody else in the office; (c) she was told that she could not leave, and that she had to talk with them; (d) she was asked many questions and Defendant Detective Perez did most of the talking; (e) when she told them nothing had happened or that she didn't remember, she was called a liar; (f) she was told she would have to stay in Pinecrest until she told them that her parents did things to her and her sisters; (g) they kept questioning her about the same things, telling her she was hiding the truth; (h) after several hours, she agreed to write down some answers to Defendant Detective Perez's written questions; (i) Defendant Detective Perez tore up his notes when they were finished; and (j) Defendant Detective Perez had a tape records with him, and recorded the interview (the location of the tape is unknown).

24. Jessica Cunningham further testified that: she did not want to stay at Pinecrest; she considered the place "hell"; she was medicated against her will; and she was withheld privileges if she didn't do what they wanted. She also testified that she did not make any disclosures of sexual abuse to anyone at Pinecrest until after this interview.

25. Defendant Reiman's report reflects statements from Jessica which are inconsistent with other statements made by Jessica with respect to the last alleged encounter between Jessica and her father.

26. On June 10, 1994, Defendant Detective Perez interviewed Jennifer and Sarah Cunningham, wherein they made allegations of sexual abuse against both of their parents. Again, these statements are inconsistent with statements made by Jennifer and Sarah elsewhere.

27. On June 11, 1994, Defendant Reiman was advised by Defendant Detective Perez that both Sarah and Jennifer Cunningham, had given their police statements describing sexual abuse by Plaintiff and their mother, Connie, and that the police had arrested Connie and placed her in jail. Neither Defendant Reiman, nor anyone else from CPS, were present, or involved when Sarah and Jennifer Cunningham gave these statements to the police describing sexual abuse by both of their parents.

28. On June 15, 1994, a Chelan County Prosecutor, Alicia Nakata, filed a supplemental affidavit of probable cause and amended information reciting the allegations of sexual abuse made by Sarah and Jessica Cunningham to Defendant Detective Perez on June 10, 1994, and charging Plaintiff with sexually abusing them, as well as Jessica Cunningham.

29. There is no evidence that either the police or prosecutors were relying on anyone from CPS, including Defendant Reiman, in making these arrests and charging decisions, as well as determinations of probable cause.

30. On June 15, 1994, Defendant Reiman brought a motion in the juvenile court seeking authorization to place Jessica and Sarah Cunningham in shelter care, which Chelan County Superior Court Judge Carol Wardell granted that same day.

31. Also on June 15, 1994, Defendant Reiman petitioned the juvenile court to

have the Cunninghams' two minor children, Jessica and Sarah, made dependents of the court.

32. On July 21, 1994, the juvenile court conducted a placement hearing and approved the foster care placements and continued shelter care of Jessica and Sarah Cunningham.

33. On July 22, 1994, Defendant Reiman submitted to the juvenile court his report for dependency fact-finding hearing.

34. On August 15, 1994, Plaintiff pled guilty to the charges of sexually abusing Jessica, Sarah, and Jennifer Cunningham, and adopted by attachment his June 3, 1994, written statement as the factual basis for the plea.

35. On August 26, 1994, Defendant Reiman filed amended dependency petitions for Jessica and Sarah Cunningham, referencing Plaintiff's plea of guilty and the continuing incarceration of Connie Cunningham pending her criminal trial, scheduled for August 30, 1994.

36. On September 9, 1994, a jury found Connie Cunningham guilty of sexually abusing her daughters.

37. On October 19, 1994, Plaintiff signed a relinquishment of custody, consent to termination/adoption, and waiver of right to receive notice of proceedings.

38. On October 21, 1994, a dependency fact-finding and disposition hearing was held in Plaintiff's absence pursuant to the aforementioned relinquishment, consent and waiver.

39. On December 1, 1994, the juvenile court entered a permanency planning review order.

40. On December 7, 1994, Defendant Reiman transferred the Jessica and Sarah Cunningham cases from CPS to DSHS's Child Welfare Services [CWS] for ongoing permanency planning. At this point Defendant Reiman ceased to be involved in the Cunningham case.

41. On July 6, 1995, the juvenile court entered findings of fact and orders terminating Plaintiff's parental rights as to both Jessica and Sarah Cunningham without the participation of Plaintiff pursuant to the aforementioned relinquishment, consent and waiver.

42. Defendant Reiman was not a member of the Interdisciplinary Sexual Abuse Team [IDSAT].

43. Connie Cunningham appealed her criminal conviction, resulting in a reversal and remand for a new trial due to a finding that the admission of the Plaintiff's written statement in her trial, where there was no showing Plaintiff was unavailable to testify, violated Connie Cunningham's rights under the Sixth Amendment confrontation clause.

44. On March 4, 1999, the Washington Court of Appeals vacated the Plaintiff's conviction, after the prosecutor agreed to Petitioner's Personal Restraint Petition, and allowed Plaintiff to withdraw his guilty plea and receive a new trial. On November 3, 1999, Plaintiff and the local prosecutor jointly moved for an order dismissing the criminal charge against him due to a speedy trial rule violation. The Order was entered on November 5, 1999, terminating the criminal proceeding against Plaintiff.

## III. MOTION FOR SUMMARY JUDGMENT

**Summary Judgment Standard.** A court should grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that no genuine issue of

material fact exists and that the court should grant judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). A court must construe all facts and all justifiable inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Marks v. United States,* 578 F.2d 261, 263 (9th Cir.1978). The non-moving party may use affidavits, depositions, answers to interrogatories, and admissions to do this. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. A district court must enter summary judgment against a party who fails to make a showing sufficient to establish an essential element of a claim, even if genuine factual disputes exist regarding other elements of the claim. *Id.* at 322–23, 106 S.Ct. 2548. No issue for trial exists unless sufficient evidence favors the non-moving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Thus, a scintilla of evidence in support of the non-moving party's position will not suffice. *Id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment based on immunity, where the parties do not dispute the material issues of fact, a district court may establish as a matter of law that immunity protects a defendant from damages liability. *Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir. 1988). Absolute immunity of a defendant defeats a § 1983 cause of action at the outset of the case, so long as the official's actions were within the scope of the immunity. *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). A defendant public official seeking the protection of absolute immunity from liability for damages arising out of the official's action while performing a particular governmental function bears the burden of proving immunity for the function in question. *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In evaluating any defense of immunity, a court must accept the complainant's allegations as true. *Kalina v. Fletcher,* 522 U.S. 118, 122, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997); *Burns,* 500 U.S. at 486, 111 S.Ct. 1934; *Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999).

Federal law controls the question of immunity in cases where a plaintiff alleges a violation of his constitutionally protected rights under 42 U.S.C. § 1983. *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh'g denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980).

## A. ABSOLUTE IMMUNITY IN § 1983 ACTIONS.

Defendant Reiman, a social worker with the CPS, asserts a defense of absolute immunity. The issue of a social worker's entitlement to absolute immunity was thoroughly examined very recently in *Miller v. Gammie,* 292 F.3d 982 (9th Cir.2002). In *Miller,* the court set forth the proper analysis for absolute immunity determinations beginning with the premise that:

> the crucial inquiry in resolving a claim of absolute immunity is whether the function for which immunity is claimed is so much an integral part of the judicial process that to deny immunity would disserve the broader public interest in having participants such as judges, advocates and witnesses perform their re-

spective functions without fear of having to defend their actions in a civil lawsuit. *Miller*, 292 F.3d at 988–89 (*quoting Babcock v. Tyler*, 884 F.2d 497, 502 (9th Cir. 1989)). The *Miller* court then addressed the recognized bases of caseworkers' absolute immunity: "absolute prosecutorial immunity" for "initiating and pursuing child dependency proceedings, and in seeking and obtaining a court order for the seizure and placement of a newborn child" and "absolute quasi-judicial immunity" in cases where "a child protective services worker ... executes a court order for seizure and placement of a child[.]" *Miller*, 292 F.3d at 989 (*quoting Babcock*, 884 F.2d at 502).

In *Miller*, the Ninth Circuit reiterated its prior holding that absolute immunity was afforded to caseworkers even in the face of a plaintiff's claim that the caseworker's actions were not in pursuance of an initial dependency order and not protected by absolute immunity as " 'purely administrative or ministerial' acts performed ... in connection with the supervision and placement of children[.]" *Miller*, 292 F.3d at 989 (*quoting Babcock*, 884 F.2d at 502–03). This is true because dependency proceedings "include post-adjudication activities as well as acts by which the proceedings are initiated." *Id.* (*quoting Babcock*, 884 F.2d at 503). Thus, it is the law of the circuit that where "all of [the caseworkers'] actions of which the plaintiffs complain were taken in *connection with*, and *incident to*, ongoing child dependency proceedings" the caseworkers are entitled to absolute immunity. *Id.* at 989 (*quoting Babcock*, 884 F.2d at 503) (emphasis provided by *Miller* court).

This is consistent with the court's decision in *Meyers v. Contra Costa County Dept. of Social Servs.*, 812 F.2d 1154 (9th Cir.), *cert. denied*, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987). In *Meyers*, similar to the present case, the plaintiff complained that a CPS worker "supervis[ed] an investigation and fil[ed] verified dependency petitions" asking the court to declare the children dependent and removed from their father. *Meyers*, 812 F.2d at 1156. On appeal, the court held that "social workers are entitled to immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Id.* at 1157.

Even where a complaint alleges caseworker misconduct—"failure to disclose, concealment ... or misrepresentation"— "the claims are barred by absolute immunity." *Miller* at 989. Furthermore, as is the case here, "[a] social case-worker's entitlement to the defense of absolute immunity in the performance of her duties incident to child dependency proceedings cannot be defeated by allegations that the case-worker conspired with one of the parties to affect the outcome of the case." *Miller*, 292 F.3d at 990 (*quoting Babcock*, 884 F.2d at 503). "Thus ... even claims of intentional wrongdoing against social workers are barred, to the extent that they allege intentional wrongdoing 'in connect with, and incident to, ongoing child dependency proceedings.' " *Id.* (*quoting Babcock*, 884 F.2d at 504).

The *Miller* court recognized that a grant of absolute immunity in the face of a caseworker's wrongdoing (i.e., placing a known sexual predator into a home with two small children without warning the foster parents) would leave "genuinely wronged" litigants without redress. *Id.* at 990–91. However, the court reasoned, "the alternative of affording only qualified immunity to child service workers would disserve the broader public interest, as it would prevent the vigorous and fearless performance of their duties in child dependency proceedings." *Miller*, 292 F.3d at 991 (citing *Babcock*, 884 F.2d at 503) (*quoting Imbler v.*

*Pachtman,* 424 U.S. 409, 427–28, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)) (internal quotation marks omitted).

■ Thus, according to the current Ninth Circuit law set forth in *Miller,* Defendant Reiman is entitled to absolute immunity with respect to all of his actions associated with § 1983 liability in bringing the dependency proceeding. Even Defendant Reiman's contacts with individuals at the Wenatchee Police Department—regardless of intentional wrongdoing—were "in connect with, 'and incident to, ongoing child dependency proceedings" so as to entitle Defendant Reiman to absolute immunity. *Id.* at 989 (*quoting Babcock,* 884 F.2d at 503–04). This is particularly true in light of statutory directives requiring law enforcement and DSHS responding to a child abuse complaint to "coordinate the investigation and keep each other apprised of progress" when one agency discovers the other is involved. WASH.REV.CODE § 26.44.035(1).

Defendant Reiman's immunity is grounded in the determination that "the function for which immunity is claimed is so much an integral part of the judicial process that to deny immunity would disserve the broader public interest in having [Defendant Reiman] perform [his] function[ ] without fear of having to defend [his] actions in a civil lawsuit" because to hold otherwise "would compromise caseworkers' judgment during this phase of the proceedings and would deprive the court of information it needs to make an informed decision." *Miller* at 988–89 (citations omitted).

Since absolute immunity applies to all of the claims against him in the § 1983 action, the defenses of collateral estoppel, judicial estoppel, qualified immunity and

proximate cause do not require address in this context.

## B. STATE CLAIMS.

■ **1. *Negligence.*** The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach. *Hertog, ex. rel. S.A.H. v. City of Seattle,* 138 Wash.2d 265, 275, 979 P.2d 400 (1999). There are two elements of proximate cause—cause in fact and legal causation. *Id.* at 282, 979 P.2d 400. Cause in fact relates to "but for" causation—"events the act produced in a direct unbroken sequence which would not have resulted had the act not occurred." *Id.* at 282–83, 979 P.2d 400. In this case, Plaintiff Cunningham is required to show that Defendant Reiman's actions were a cause which in a direct sequence produced Plaintiff Cunningham's harm and without which, the harm would not have happened. *Id.; see also* WPI 15.01. The harm Plaintiff Cunningham claims is derived from the criminal action—his arrest, incarceration, prosecution, and imprisonment—as well as the loss of his family relationship.

■ With respect to the criminally related damages, Plaintiff Cunningham cannot establish a causal relationship between his prosecution and the actions of Defendant Reiman. A criminal investigation was already under way by the time Defendant Reiman became involved on June 6, 1994. In fact, on June 3, 1994, Plaintiff Cunningham was arrested and jailed, based in part upon a prepared statement signed by Plaintiff Cunningham setting forth conduct sufficient to convict him of the crimes for which he was charged. In fact, the same signed statement was adopted by Plaintiff Cunningham at the time of the guilty plea on August 15, 1994, when he attached it to his Statement of Defendant on Plea of Guilty as a factual

basis for the plea.[2] Obviously, little had changed between the time the statement was prepared and Plaintiff Cunningham's conviction upon plea to change the course of the criminal action—and there is certainly no evidence that Defendant Reiman altered the course of the criminal action. There is no evidence that decisions to arrest and prosecute Plaintiff Cunningham were influenced by Defendant Reiman. Reasonable minds could not find that Defendant Reiman's actions were a cause which in a direct sequence produced Plaintiff Cunningham's damages inherent to his conviction and without which, the harm would not have happened.

With respect to damages related to the loss of family relations, there is evidence that the family relationship was involved in continuous and apparently unresolved upheavals for some period of time. Specifically, the family had already suffered a significant difficulties and breakdowns prior to Defendant Reiman's involvement: (1) the parties were involved in family counseling sessions even before June 3, 1994;[3] (2) Jessica Cunningham received "mental health care counseling" since she was in grade school;[4] (3) Jessica Cunningham ran away from home and expressed that she did not wish to live at home any more before she was admitted into Pinecrest;[5] (3) Mrs. Cunningham intended to leave the family home and/or divorce Plaintiff Cunningham;[6] (4) Sarah Cunningham did not want to live at home any longer;[7] (5) Jennifer Cunningham announced that she was moving out of the family home and refused to give Plaintiff Cunningham her address;[8] and (6) Jennifer and Sarah Cunningham acted angry and/or hostile toward Plaintiff Cunningham in the week preceding June 3, 1994.[9]

Significantly, Plaintiff Cunningham himself stated that there was "some underlying hostility that had been going on for a while that hadn't been resolved."[10] Plaintiff Cunningham attributed the situation, in part, due to Jessica Cunningham's admission to Pinecrest Hospital, but Plaintiff Cunningham also testified in more general terms that the difficulties also related to manifestations of Plaintiff Cunningham's mental illness and his daughters' embarrassment in relation to Plaintiff Cunning-

---

**2.** Item 11 on the Statement of Defendant on Plea of Guilty form provides: "The judge has asked me to state briefly in my own words what I did that makes me guilty of this crime. This is my statement: see attached statement [written in handwriting]."

**3.** Deposition of Plaintiff Cunningham, p. 33 (Exh. 1 to Freimund Decl.).

**4.** Deposition of Plaintiff Cunningham, p. 33–34 (Exh. 1 to Freimund Decl.).

**5.** Deposition of Plaintiff Cunningham, p. 32 (Exh. 1 to Freimund Decl.); Deposition of Jessika Dawn Still, p. 25 (Exh. 11 to Draper Decl).

**6.** Deposition of Plaintiff Cunningham, p. 56, 132–35 (Exh. 1 to Freimund Decl.) (based on comments or information from Sarah Cunningham, Mrs. Cunningham, and Carol Doggett).

**7.** Deposition of Plaintiff Cunningham, p. 53, 132 (Exh. 1 to Freimund Decl.) (based on Plaintiff Cunningham's conversation with Sarah Cunningham). However, Sarah continued to live at the family home. *Id.* at 132.

**8.** Deposition of Plaintiff Cunningham, p. 54–55, 132 (Exh. 1 to Freimund Decl.) (based on Plaintiff Cunningham's conversation with Jennifer Cunningham). However, "Jennifer kept coming back to the house and kept living there". *Id.* at 132.

**9.** Deposition of Plaintiff Cunningham, p. 56, 121–28 (Exh. 1 to Freimund Decl.) (based on Plaintiff Cunningham's observations).

**10.** Deposition of Plaintiff Cunningham, p. 125 (Exh. 1 to Freimund Decl.).

ham's illness as well as arguments between Mr. and Mrs. Cunningham.[11] Reasonable minds could not find that Defendant Reiman's actions were a cause which in a direct sequence produced Plaintiff Cunningham's injury to his family relations and without which, the harm would not have happened. Thus, summary judgment in favor of Defendant Reiman must be granted on Plaintiff's negligence claim.

The Court declines Plaintiff Cunningham's invitation to apply the "substantial factor" test in the present case. The application of the substantial factor test is generally reserved for specific circumstances not present here. *See* 14 DAVID K. DEWOLF & KELLER W. ALLEN, WASH. PRAC., TORT LAW AND PRACTICE § 4.4 (2d ed. 2000) (Washington law recognizes three exceptions where plaintiff may be excused from proving the threshold requirement of cause in fact: (1) "plaintiff is excusably ignorant of the *identity* of the tortfeasor who caused his injury;" (2) "plaintiff would probably have been injured anyway, but lost a significant *chance* of avoiding the injury;" or (3) "plaintiff has been injured by *multiple independent causes*, each of which would have been sufficient to cause the injury.") (emphasis in original). The rationale of the "substantial factor" test permits a plaintiff to recover where the plaintiff has lost an opportunity and has no other redress. *Daugert v. Pappas*, 104 Wash.2d 254, 261, 704 P.2d 600 (1985). In *Daugert*, the Washington Supreme Court limited the application of the test to cases "only where the defendant's negligence caused a 'separate and distinguishable harm.'" *Id.* The Plaintiff's claim is not a situation in which the test has been applied. *See also, Tyner v. Department of Social & Health Servs.*, 92 Wash.App. 504, 514, 963 P.2d 215 (1998) (cause in fact is a required element in cases involving negli-

gent investigation by DSHS), *reversed on other grounds*, 141 Wash.2d 68, 82, 1 P.3d 1148 (2000) (discussion of the requirements of proximate cause with focus upon legal cause, in case of negligent investigation by DSHS does not mention application of "substantial factor" test); *McKinney v. State*, 134 Wash.2d 388, 406–07, 950 P.2d 461 (1998) (jury instructed on proximate cause in case involving negligent investigation by DSHS without mention of "substantial factor" test); *Waller v. State*, 64 Wash.App. 318, 333, 824 P.2d 1225 (1992) (proximate cause required in negligent investigation case involving DSHS); *Gilliam v. Department of Social & Health Servs.*, 89 Wash.App. 569, 587, 950 P.2d 20 (Baker, C.J., concurring), *review denied*, 135 Wash.2d 1015, 960 P.2d 937 (1998) (proximate cause a required element in case involving negligent investigation by DSHS caseworkers).

■ **2. *Interference with Custodial Relations.*** In *Strode v. Gleason*, 9 Wash. App. 13, 510 P.2d 250 (1973), the Court of Appeals recognized a cause of action for the alienation of a child's affection. Strode lists the elements of this cause of action as being: (1) an existing family relationship; (2) a malicious or unjustifiable interference with the relationship by a third person; (3) an intention on the part of the third person that such malicious interference results in a loss of affection; (4) a causal connection between the third party's conduct and the loss of affection; and (5) resulting damages. For the same reasons as set forth above, Plaintiff cannot show the requisite causal connection. Therefore, Plaintiff's claim for interference with custodial relations against Defendant Reiman must fail.

**3. *Negligent Infliction of Emotional Distress.*** In *Hunsley v. Giard*, 87 Wash.2d 424, 435–36, 553 P.2d 1096 (1976),

---

**11.** Deposition of Plaintiff Cunningham, p. 125–26 (Exh. 1 to Freimund Decl.).

the Washington Supreme Court recognized the tort of negligent infliction of emotional distress and held that the claim is tested against the "established concepts of duty, breach, proximate cause, and damage or injury." *Reid v. Pierce County*, 136 Wash.2d 195, 204, 961 P.2d 333 (1998) (*quoting Hunsley*, 87 Wash.2d at 434, 553 P.2d 1096). Defendant Reiman's motion for summary judgment on this claim must be granted because, as discussed above, Plaintiff cannot show proximate cause.

**4. *Outrage.*** To establish an intentional infliction of emotional distress claim, a plaintiff must show: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) severe emotional distress on the part of the plaintiff. *Reid v. Pierce County*, 136 Wash.2d 195, 202, 961 P.2d 333 (1998). A plaintiff may not sue for outrage unless he or she was present when the conduct occurred. *Id.* at 204, 961 P.2d 333. The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Dicomes v. State*, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (*quoting Grimsby v. Samson*, 85 Wash.2d 52, 59, 530 P.2d 291 (1975) (emphasis omitted)). Furthermore, "mere insults and indignities, such as causing embarrassment or humiliation, will not support imposition of liability." *Id.*

A trial court should make an initial determination of whether a plaintiff has submitted sufficient evidence to show that a defendant's conduct rises to the level necessary to support a claim of outrage. *Case v. Kitsap County Sheriff's Dept.*, 249 F.3d 921, 932 (9th Cir.2001) (citing *Reid v. Pierce County*, 136 Wash.2d 195, 961 P.2d 333, 337 (1998)). In the present case Plaintiff has not shown that

he was present when the conduct alleged. Even if Plaintiff were to prove that he was present, the Plaintiff has failed to assert any facts specifically establishing that his emotional distress resulted from any actions by Defendant Reiman or otherwise present facts which indicate a triable issue for outrage. *See Miles v. Child Protective Servs.*, 102 Wash.App. 142, 157, 6 P.3d 112 (2000) (upheld trial court's determination that wrongful removal of children from home and their placement in dependency based on claims of parental abuse was not sufficient to support a claim of outrage); *Pettis v. State*, 98 Wash.App., 553, 990 P.2d 453 (1999) (trial court properly dismissed claim against CPS worker where evidence of extreme and outrageous conduct was lacking).

As such, Defendant Reiman's summary judgment motion as to Plaintiff's claims for intentional infliction of emotional distress must be granted.

### III. CONCLUSION

No disputed issue of material fact exists regarding Defendant Reiman's actions in his role as a caseworker for the purposes of determining whether immunity protects him from damages liability. Defendant Reiman is absolutely immune for all of his actions alleged by Plaintiff in his § 1983 claim as they were taken in connection with and incident to the investigation, initiation, adjudication and post-adjudication of the dependency action, regardless of intentional wrongdoing. Therefore, the Court grants Defendant Reiman's Motion for Summary Judgment relating to Plaintiff's § 1983 claims. Furthermore, Plaintiff has failed to present sufficient facts to survive summary judgment on his state law claims against Defendant Reiman. Therefore, the Court also dismisses those claims. Accordingly,

**IT IS ORDERED** that:

1. Defendant Reiman's Motion for Summary Judgment, **Ct.Rec. 207,** is **GRANTED.** Plaintiff's claims against Defendant Reiman are **DISMISSED WITH PREJUDICE.**

2. The District Court Executive and all parties shall **REMOVE** Defendant Reiman from the caption in all future filings.

The District Court Executive is directed to do the following:

(a) File this Order:

(b) Enter **JUDGMENT** for Defendant Reiman consistent with this Order; and

(c) Provide copies of this Order and the Judgment to counsel **VIA FACSIMILE:**

| | |
|---|---|
| Glenn Draper | 206–282–3367 |
| Ari Brown | 206–332–0154 |
| Michael Pierson | 206–389–1708 |
| Patrick McMahon | 509–663–0679 |
| John Francis Kennedy | 253–853–6479 |
| Jennifer Ilenstine | 206–624–5944 |
| James Macpherson | 206–780–3868 |
| Jeffrey Freimund | 360–459–6967 |