335 F.3d 889
 Christine L. MILLER, Guardian Ad Litem; Tonnie Savage, Guardian Ad Litem, Plaintiffs-Appellees,
v.
Nancy GAMMIE; Fran Zito, Defendants-Appellants, and
Nevada Child And Family Services Department; Nevada Child Welfare Division; State of Nevada; Volunteers of America of Nevada, Defendants.
 No. 01-15491.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 9, 2002.
 Filed July 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Stephen D. Quinn, Carson City, Nevada, for the defendants-appellants.
 Calvin R.X. Dunlap and Carolyn Kubitschek, Lansner & Kubitschek, New York, New York, for the plaintiffs-appellees.
 Appeal from the United States District Court for the District of Nevada; Howard D. McKibben, District Judge, Presiding. D.C. No. CV-99-00275-HDM(PHA).
 Before: SCHROEDER, Chief Judge, KOZINSKI, O'SCANNLAIN, RYMER, T.G. NELSON, TASHIMA, McKEOWN, FISHER, PAEZ, TALLMAN, and CLIFTON, Circuit Judges.
 Opinion by Chief Judge SCHROEDER; Concurrence by Judge KOZINSKI, Concurrence by Judge O'SCANNLAIN, Concurrence by Judge TASHIMA.
 SCHROEDER, Chief Judge.
 
 I. OVERVIEW
 
 1
 We took this case en banc to clarify the narrow scope of absolute immunity after Supreme Court decisions have taken an approach that is fundamentally inconsistent with the reasoning of our earlier circuit authority involving immunity for family-service social workers. Compare Babcock v. Tyler, 884 F.2d 497, 502-03 (9th Cir.1989), with Kalina v. Fletcher, 522 U.S. 118, 127-29, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), and Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432-37, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993).
 
 
 2
 The three-judge panel felt itself bound by Babcock and therefore held that the social worker and the therapist in this case enjoyed absolute rather than qualified immunity for all their actions "taken in connection with, and incident to, ongoing child dependency proceedings." Miller v. Gammie, 292 F.3d 982, 989 (9th Cir.2002) (emphasis omitted) (quoting Babcock, 884 F.2d at 503). The Supreme Court adopted a different analysis in Antoine and Kalina, however, that makes absolute immunity depend on the particular function performed rather than on whether the state officer's position had a general relationship to a judicial proceeding.
 
 
 3
 We are asked to review a district court order that deferred a ruling, pending limited discovery, on the defendants' motion to dismiss on grounds of absolute immunity. Because we conclude that the order is not appealable, we construe this notice of appeal as a petition for a writ of mandamus. See Cordoza v. Pac. States Steel Corp., 320 F.3d 989, 996-98 (9th Cir.2003). We review the merits of the district court's order on the scope of absolute immunity within the framework of the five factors set out in Bauman v. United States District Court, 557 F.2d 650, 654-55 (9th Cir.1977), which include whether the district court clearly erred.
 
 
 4
 The three-judge panel, in reversing the district court, felt itself bound by our prior circuit law and held that the district court should have dismissed the case on immunity grounds. We now clarify our law concerning the sometimes very difficult question of when a three-judge panel may reexamine normally controlling circuit precedent in the face of an intervening United States Supreme Court decision, or an intervening decision on controlling state law by a state court of last resort. We hold that in circumstances like those presented here, where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled. We hold that Antoine and Kalina effectively overruled Babcock to the extent its reasoning is inconsistent with them and that the district court did not err in ordering limited discovery as to the functions performed by the defendants. We remand to the district court to apply the appropriate analysis to the facts developed after further discovery.
 
 II. FACTUAL BACKGROUND
 
 5
 The facts are not complex. At this stage of the litigation, we must accept them as they were set forth in the complaint. See Mitchell v. Forsyth, 472 U.S. 511, 528 & n. 9, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). They are recited in more detail in the panel opinion. See Miller, 292 F.3d at 983-86.
 
 
 6
 In December 1996, the Nevada Division of Child and Family Services (DCFS) removed twelve-year-old Earl Doe and his older brother from their home to protect them from the horrific physical and sexual abuse they had suffered, and to prevent them from inflicting abuse on other children. DCFS placed them in an emergency foster-care facility. Defendant-Appellant Nancy Gammie, a DCFS social worker, was responsible for Earl's case, and Defendant-Appellant Fran Zito, a DCFS social therapist, provided therapy to Earl.
 
 
 7
 Soon after removing Earl from his home, DCFS petitioned the Nevada Juvenile Court to declare Earl a ward of the State and to grant DCFS custody. The juvenile court approved the removal and placed Earl into the custody of DCFS. A clearly troubled youth, Earl stumbled through foster care and eventually came to live in a Volunteers of America (VOA) emergency shelter.
 
 
 8
 In her six-month report to the juvenile court, Gammie elaborated on the extent of Earl's sexual-abuse history, informed the court of his current placement, and of her plan to place Earl "into a more homelike setting within the next few weeks." The juvenile court approved Gammie's recommendations.
 
 
 9
 On December 2, 1997, Gammie placed Earl into John and Jane Roe's home as a foster child. John and Jane were the parents of two young children, but Gammie did not tell the Roes about Earl's abusiveness. The next day, Gammie submitted her second six-month report to the juvenile court. In it, she reported Earl's placement in the Roes' home; however, she did not mention the Roes' young children. Gammie noted that Earl still required extensive therapy in order to deal with his past sexual abuse "and to reach the point of being safe with other children."
 
 
 10
 Zito treated Earl during his placement with John and Jane, who accompanied him to therapy sessions. It was revealed to Zito that Earl had both suffered sexual abuse in prior placements and had sexually abused others. Jane asked Zito if her natural children were safe with Earl in their home. Zito assured Jane that she had nothing to worry about.
 
 
 11
 According to the complaint, Earl's placement with John and Jane Roe was tragically unsuccessful. Only two months after Earl's placement, the Roes' son, Joe, informed his parents that Earl had molested him. Two days later, Earl was arrested and admitted to sodomizing Joe three to five times.
 
 III. PROCEDURAL BACKGROUND
 
 12
 On June 16, 1999, Tonnie Savage, as guardian ad litem for Earl Doe, the real party in interest, filed a complaint in Nevada state court alleging civil-rights violations under 42 U.S.C. § 1983 and various state-law claims in connection with Earl's placement in John and Jane Roe's home. The defendants included DCFS, Gammie, Zito, and VOA. Joe Roe, through his guardian ad litem, Christine Miller, also filed suit against the defendants but has since settled. The claims against VOA were settled as well.
 
 
 13
 After removal to federal district court, DCFS, Gammie, and Zito moved for dismissal on the pleadings. The district court dismissed the claims against DCFS and the claims against Gammie and Zito in their official capacities on Eleventh Amendment grounds. The court remanded the state-law claims to Nevada state court. Those rulings have not been appealed.
 
 
 14
 With respect to the claims against Gammie and Zito in their individual capacities, the district court declined to grant or deny the motion to dismiss insofar as it requested dismissal upon the basis of absolute immunity. Explaining that not enough information was available to determine whether absolute immunity applied, the court granted leave to raise absolute immunity as a defense at the completion of limited discovery. Because an outright denial of the motion to dismiss on absolute immunity grounds clearly would have been an appealable order under Mitchell v. Forsyth, and the district judge wanted to avoid a time-consuming appeal if possible, the judge did not expressly deny the motion to dismiss on the pleadings. Rather, the court entered an order lifting the stay of discovery for 120 days to permit discovery on the narrow and limited issue of absolute immunity. It deferred ruling on immunity pending such discovery. The defendants filed a timely notice of appeal from that procedural order.
 
 IV. APPELLATE JURISDICTION
 
 15
 This is an appeal from the deferral, pending limited discovery, of a ruling on a motion to dismiss on grounds of absolute immunity. Orders denying immunity are generally appealable. Mitchell, 472 U.S. at 525, 105 S.Ct. 2806. The district court in this case, however, did not enter an order that categorically denied the motion to dismiss on the ground of absolute immunity. Rather, it deferred ruling on Gammie and Zito's absolute immunity claim until completion of limited discovery. The three-judge panel treated that deferral as an effective denial of the motion, and it assumed appellate jurisdiction under the collateral-order doctrine stemming from the Supreme Court's decision in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546-47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Miller, 292 F.3d at 987; see also Mitchell, 472 U.S. at 527, 105 S.Ct. 2806. The panel pointed out that the Supreme Court has held that absolute immunity, where applicable, is a protection not only from liability but also from being answerable in any way for one's actions. Miller, 292 F.3d at 987 (citing Mitchell, 472 U.S. at 525-26, 105 S.Ct. 2806).
 
 
 16
 District court orders deferring a ruling on immunity for a limited time to ascertain what relevant functions were performed generally are not appealable. This is because they are not orders that deny the claimed existence of immunity, which are interlocutorily appealable on that basis. Mitchell, 472 U.S. at 525, 105 S.Ct. 2806. Nor are they appealable under Cohen, because collateral orders are appealable only when they conclusively decide a collateral issue. See Cohen, 337 U.S. at 546, 69 S.Ct. 1221. An order deferring a ruling is not conclusive.
 
 
 17
 Because the order in this case was not itself immediately appealable, as the district court fully understood, we cannot review it de novo as we would on ordinary appellate review. We can, however, as we have done in past similar situations, treat the notice of appeal as a petition for a writ of mandamus and consider the issues under the factors set forth in Bauman. See Cordoza, 320 F.3d at 998.
 
 
 18
 Mandamus is "an extraordinary remedy that may be obtained only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Id. (internal quotation marks omitted). We review the district court's order for clear error and issue the writ only for "usurpation of judicial power or a clear abuse of discretion." Id. Under the five factors set forth in Bauman, we must consider whether:
 
 
 19
 (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.
 
 
 20
 Bauman, 557 F.2d at 654-55 (citations omitted); see also Cordoza, 320 F.3d at 998. Those guidelines "often raise questions of degree[,]" and "[t]he considerations are cumulative and proper disposition will often require a balancing of conflicting indicators." Bauman, 557 F.2d at 655.
 
 V. WHETHER THE DISTRICT COURT CLEARLY ERRED
 
 21
 A. The Appropriateness of Deferring a Ruling on Immunity in This Case
 
 
 22
 The dispositive factor in this case is whether the district court's order is clearly erroneous as a matter of law. This is because the first two Bauman factors weigh in favor of granting mandamus. The defendants, if they were immune, would be prejudiced by the order continuing the litigation, even for the duration of limited discovery, because they would be required to continue to participate in litigation. The appellate process, after final judgment, could not redress that injury. Mitchell, 472 U.S. at 525, 105 S.Ct. 2806. The last two factors do not support granting relief because there was no repeated error or disregard of rules, and the issue of immunity is not one of first impression.
 
 
 23
 Therefore, we turn to the critical issue of whether the district court clearly erred as a matter of law in deferring a ruling on immunity until completion of limited discovery on what functions the defendants performed. This requires us to consider when state officials enjoy absolute immunity from suit.
 
 
 24
 The civil-rights statute, 42 U.S.C. § 1983, was enacted in 1871. It enables those individuals whose rights were deprived by persons acting under color of state law to bring their claims in federal court. On its face, § 1983 does not include any defense of immunity. Nevertheless, the Supreme Court has recognized that when Congress enacted § 1983, it was aware of a well-established and well-understood common-law tradition that extended absolute immunity to individuals performing functions necessary to the judicial process. See Forrester v. White, 484 U.S. 219, 225-26, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); Imbler v. Pachtman, 424 U.S. 409, 418-24, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Thus, it was presumed that if Congress had wished to abrogate common-law immunity, it would have done so expressly. Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).
 
 
 25
 The Supreme Court in Imbler laid down an approach that granted state actors absolute immunity only for those functions that were critical to the judicial process itself. See Imbler, 424 U.S. at 430, 96 S.Ct. 984; see also Burns v. Reed, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). At common law, judges, prosecutors, trial witnesses, and jurors were absolutely immune for such critical functions. See Burns, 500 U.S. at 490, 111 S.Ct. 1934 (quoting Lord Mansfield in King v. Skinner, Lofft 55, 56, 98 Eng. Rep. 529, 530 (K.B.1772) ("[N]either party, witness, counsel, jury, or Judge can be put to answer, civilly or criminally, for words spoken in office.")).
 
 
 26
 Imbler also settled the general scope and rationale of a prosecutor's immunity. Only in "initiating a prosecution and in presenting the State's case" is the prosecutor absolutely immune. Imbler, 424 U.S. at 431, 96 S.Ct. 984. That is because the prosecutor often must make "decisions that could engender colorable claims of constitutional deprivation" upon short notice and with poor information. Id. at 425, 96 S.Ct. 984. Exposing a prosecutor, years and many cases later, to civil damages for a particular prosecutorial decision could impose intolerable burdens on the prosecutor and unduly hamper the prosecutor's performance. Id. at 425-26, 96 S.Ct. 984. There are protections from abuse despite this broad grant of immunity. The duties of the trial judge, and the adversarial and appellate processes, are designed to prevent many potential violations of constitutional rights. See Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).
 
 
 27
 Our court has recognized that family-service social workers, like appellant Gammie in this case, appear to perform some functions similar to those of prosecutors, but perform other functions as well. Our relevant circuit law begins with Meyers v. Contra Costa County Department of Social Services, 812 F.2d 1154 (9th Cir.1987), where we took a narrow view of absolute immunity for social workers. In Meyers, we held that the initiation and pursuit of child-dependency proceedings were prosecutorial in nature and warranted absolute immunity on that basis. We were careful there, however, to distinguish between a social worker's activities performed as an advocate within the judicial decision-making process, a function for which there is common-law absolute immunity, and other actions taken by a social worker. Id. at 1157. We found that unless the social worker's activity has the requisite connection to the judicial process, only qualified immunity is available. See id. at 1158.
 
 
 28
 Babcock extended the coverage of absolute immunity to include post-adjudication activities. Babcock, 884 F.2d at 503. Our court in Babcock saw a fundamental inconsistency in protecting social workers from liability for actions taken up through the adjudication of dependency, and then exposing them to liability for the subsequent, post-adjudication and placement decisions approved by court orders. Id. Thus, we held that all actions taken in "connection with" and "incident to" ongoing child dependency proceedings were entitled to absolute immunity. Id. Four years after Babcock, the Supreme Court held in Antoine, however, that absolute immunity shields only those who perform a function that enjoyed absolute immunity at common law. Even actions taken with court approval or under a court's direction are not in and of themselves entitled to quasi-judicial, absolute immunity. Antoine, 508 U.S. at 435-36, 113 S.Ct. 2167. Instead, to enjoy absolute immunity for a particular action, the official must be performing a duty functionally comparable to one for which officials were rendered immune at common law. Therefore, a prosecutor's submission of an affidavit to the court as a witness, as in Kalina, or a court reporter's preparation of a transcript for the court, as in Antoine, were not absolutely immune because those functions were not absolutely immune at common law.
 
 
 29
 The Court in Kalina further emphasized that it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity. Kalina, 522 U.S. at 127, 118 S.Ct. 502. Officials performing the duties of advocate or judge may enjoy absolute immunity for some functions traditionally performed at common law, but that protection does not extend to many of their other functions. Id. at 129-31, 118 S.Ct. 502; see also Antoine, 508 U.S. at 435-37, 113 S.Ct. 2167. The Court said that although a prosecutor is fully protected by absolute immunity when performing the traditional functions of an advocate in a criminal prosecution, only qualified immunity shields the prosecutor acting as a complaining witness in presenting a judge with a supporting affidavit to establish probable cause for an arrest. This is because the common law did not recognize absolute immunity for such functions when the civil-rights statute was passed in 1871. Kalina, 522 U.S. at 123-24, 118 S.Ct. 502 (citing Imbler, 424 U.S. at 410, 96 S.Ct. 984); id. at 127 & n. 14, 118 S.Ct. 502 (citing Malley v. Briggs, 475 U.S. 335, 340-41, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). We must now recognize that beyond those functions historically recognized as absolutely immune at common law, qualified and only qualified immunity exists.
 
 
 30
 The Supreme Court expressed that principle as a presumption: "`The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant.'" Antoine, 508 U.S. at 433 n. 4, 113 S.Ct. 2167 (quoting Burns, 500 U.S. at 486-87, 111 S.Ct. 1934). The burden is on the official claiming absolute immunity to identify the common-law counterpart to the function that the official asserts is shielded by absolute immunity. Id. at 432, 113 S.Ct. 2167; Malley, 475 U.S. at 339-40, 106 S.Ct. 1092.
 
 
 31
 We look to functions that enjoyed absolute immunity at common law in 1871, because that is when Congress codified § 1983. Kalina, 522 U.S. at 123, 118 S.Ct. 502; Buckley, 509 U.S. at 275, 113 S.Ct. 2606; Antoine, 508 U.S. at 433-38, 113 S.Ct. 2167; Burns, 500 U.S. at 484-85, 111 S.Ct. 1934; Malley, 475 U.S. at 340-41, 106 S.Ct. 1092; Mitchell, 472 U.S. at 521, 105 S.Ct. 2806; Imbler, 424 U.S. at 421, 96 S.Ct. 984; Pierson, 386 U.S. at 553-54, 87 S.Ct. 1213; see also Hoffman v. Harris, 511 U.S. 1060, 114 S.Ct. 1631, 1632, 128 L.Ed.2d 354 (1994) (Thomas and Scalia, J.J., dissenting from denial of certiorari on issue of immunity for social workers). The relation of the action to a judicial proceeding, the test we formulated in Babcock, is no longer a relevant standard.
 
 
 32
 This is apparent when we look at the underlying facts in those intervening Supreme Court cases. Antoine rejected absolute immunity for court reporters. Court reporters, despite being "indispensable to the appellate process," do not exercise the sort of judgment for which there is quasi-judicial immunity. Antoine, 508 U.S. at 437, 113 S.Ct. 2167 (internal quotation marks omitted). The court reporter has no power of decision in the judicial sense. Id. at 437 n. 11, 113 S.Ct. 2167. Kalina rejected absolute immunity for a prosecutor attesting to facts in an affidavit supporting an application for an arrest warrant. The function was held to be similar to that of a complaining, out-of-court witness. The Court concluded that acting as such a witness is not a function that requires the exercise of an advocate's judgment. Kalina, 522 U.S. at 129-31, 118 S.Ct. 502.
 
 
 33
 Our decision in Meyers is consistent with the controlling Supreme Court decisions. Meyers recognized absolute immunity for social workers only for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents. Meyers, 812 F.2d at 1157. At least two of our sister circuits have also recognized that the scope of absolute immunity for social workers is extremely narrow. See, e.g., Snell v. Tunnell, 920 F.2d 673, 686-91 (10th Cir.1990) (denying absolute immunity to social workers for the function of seeking a protective custody order that did not initiate court proceedings); Vosburg v. Dep't of Soc. Servs., 884 F.2d 133, 135-38 (4th Cir.1989). In Vosburg, citing our court's decision in Meyers, the Fourth Circuit held social workers absolutely immune from liability resulting from a decision to file a removal petition, which was deemed prosecutorial, but not immune for investigating whether a removal petition should be filed. See id.
 
 
 34
 Here, the district court was obligated to examine the functions Gammie and Zito performed; however, those functions were unclear. Moreover, the defendants bear the burden of showing that their respective common-law functional counterparts were absolutely immune. It would appear that the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding. The decision, therefore, is likely entitled to absolute immunity. It also may be that some submissions to the court by social workers are functionally similar to the conduct recognized at common law to be protected by absolute prosecutorial immunity. See, e.g., Imbler, 424 U.S. at 431, 96 S.Ct. 984.
 
 
 35
 To the extent, however, that social workers also make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions, only qualified, not absolute immunity, is available. Examples of such functions may include decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care. On this record, we cannot make that determination. However, such placement decisions may not be "judicial" or "prosecutorial" decisions of the type that would have enjoyed common-law absolute immunity.
 
 
 36
 The district court, therefore, must apply the guiding principles to the allegations concerning the defendants in this case. The therapist, Zito, allegedly provided only treatment and diagnosis. She apparently is not alleged to have performed any quasi-judicial or prosecutorial function that enjoyed absolute immunity at common law, unless discovery discloses that she performed other functions more directly related to the prosecution of the dependency proceedings.
 
 
 37
 With respect to the social worker, Gammie, the precise functions performed that allegedly give rise to liability are not clear from the existing complaint. Moreover, state laws may differ as to the functions such workers perform. Under the functional analysis laid out by the Supreme Court, the district court did not err when it deferred ruling on the motion to dismiss on the pleadings until the nature of the functions the defendants allegedly performed was sufficiently outlined to permit the court to apply Antoine and Kalina.
 
 B. Whether En Banc Review Was Required
 
 38
 The issue remains, however, whether the district court and the three-judge panel were nonetheless bound to apply Babcock until it had been expressly overruled by an en banc court. We must, therefore, now address when, if ever, a district court or a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue.
 
 
 39
 Our panels have expressed differing views. The original panel opinion recognized the Supreme Court decision in Kalina, but felt bound by our precedent in Babcock. Miller, 292 F.3d at 991. The panel was "profoundly disturbed" by the actions of the defendants, analogizing the placement of Earl with the Roe family as "akin to putting an oil lamp in a dynamite bunker." Id. at 990-91. Nevertheless, the panel found Babcock factually indistinguishable from this case and therefore controlling. Id. at 991. It noted that a three-judge panel may not overrule a prior decision of the court. That proposition is unassailable so far as it goes, but it does not take into account the possibility that our prior decision may have been undercut by higher authority to such an extent that it has been effectively overruled by such higher authority and hence is no longer binding on district judges and three-judge panels of this court.
 
 
 40
 Recently, in Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir.2002), we took a more flexible approach, where we recognized that circuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that "are closely on point," even though those decisions do not expressly overrule the prior circuit precedent. Id. at 1123 (internal quotation marks omitted). We cited our decision in United States v. Lancellotti, 761 F.2d 1363 (9th Cir.1985), for the proposition that "we may overrule prior circuit authority without taking the case en banc when an `intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point.'" Galbraith, 307 F.3d at 1123 (quoting Lancellotti, 761 F.2d at 1366); see also United States v. Nachtigal, 507 U.S. 1, 2-6, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (per curiam) (holding that the Ninth Circuit erred by not finding the case controlled by intervening Supreme Court authority even though circuit authority was not expressly overruled); LeVick v. Skaggs Cos., 701 F.2d 777, 778 (9th Cir. 1983) ("[W]hen existing Ninth Circuit precedent has been undermined by subsequent Supreme Court decisions, this court may reexamine that precedent without the convening of an en banc panel."); Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 495 (9th Cir.1979) (holding that an intervening Supreme Court decision "undercut the ... theory" of the Ninth Circuit decision).
 
 
 41
 Some of our sister circuits have taken comparable, pragmatic approaches to an evolving body of common law. See, e.g., Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 337 n. 7 (4th Cir.1996) (permitting three-judge panels to overrule a prior panel upon the basis of a superseding decision of the Supreme Court); White v. Estelle, 720 F.2d 415, 417 (5th Cir.1983) (same, upon "intervening and overriding Supreme Court decisions"); Dawson v. Scott, 50 F.3d 884, 892 n. 20 (11th Cir.1995) (same, upon a "directly applicable" intervening Supreme Court decision).
 
 
 42
 The underlying principle has been most notably explicated by Justice Scalia in a law-review article describing lower courts as being bound not only by the holdings of higher courts' decisions but also by their "mode of analysis." Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L.Rev. 1175, 1177 (1989). Justice Kennedy expressed the same concept in terms of a definition of stare decisis in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). "As a general rule, the principle of stare decisis directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law." Id. at 668, 109 S.Ct. 3086 (Kennedy, J., concurring in part and dissenting in part).
 
 
 43
 We must recognize that we are an intermediate appellate court. A goal of our circuit's decisions, including panel and en banc decisions, must be to preserve the consistency of circuit law. The goal is codified in procedures governing en banc review. See 28 U.S.C. § 46; Fed. R.App. P. 35. That objective, however, must not be pursued at the expense of creating an inconsistency between our circuit decisions and the reasoning of state or federal authority embodied in a decision of a court of last resort.
 
 
 44
 We hold that the issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.
 
 
 45
 The present case is an example where intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority. As we have explained, the blanket absolute immunity for social workers recognized in Babcock is directly at odds with the functional approach taken by the Supreme Court in Antoine and Kalina. In future cases of such clear irreconcilability, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.
 
 
 46
 The district court, therefore, did not clearly err when it deferred ruling on the motion to dismiss on the pleadings until the nature of the functions the defendant allegedly performed was sufficiently outlined to permit the court to apply Antoine and Kalina. We caution, however, that we are deciding only that these defendants were not entitled to an order granting immunity upon the basis of pleadings at this prediscovery stage of the litigation. We do not preclude a grant of immunity later, upon a more developed record.
 
 
 47
 The notice of appeal is construed as a petition for a writ of mandamus. For the reasons stated above, the PETITION IS DENIED.
 
 KOZINSKI, Circuit Judge, concurring:
 
 48
 Judge Tashima's view in United States v. Johnson, 256 F.3d 895, 919 (9th Cir. 2001) (Tashima, J., concurring), that some rulings of our court may simply be ignored as "dicta" has just flunked its first reality-check. When confronted with a legal issue that is clearly presented to the en banc court, yet is not necessary to the resolution of the case — precisely what Judge Tashima called non-binding dicta in Johnson — Judge Tashima blinks. Now, we are told, there is ordinary non-binding dicta, and then there is "technically dicta" that is nonetheless binding. Judge Tashima's Concurrence at 902. The latter type of dicta is binding because there is an exception for en banc courts that Judge Tashima previously neglected to mention.
 
 
 49
 But, as Judge Tashima is careful to note, the newly-conceived exception would not apply to all en banc decisions. (Johnson, after all, is itself an en banc case.) Instead, it would apply only when an en banc court exercises its "supervisory power" to "provid[e] guidance to three-judge panels on important issues dealing with Ninth Circuit precedent," id. at 904, or when the guidance is "vital to the administration and development of the law of the circuit," id. (internal quotation marks omitted).
 
 
 50
 As I explained before, Judge Tashima's definition of dicta is unworkable because "judges often disagree about what is and what is not necessary to the resolution of a case." Johnson, 256 F.3d at 914 (Kozinski, J., concurring). Here, Judge Tashima goes one better. He would have judges and lawyers reading our en banc cases ask, not only whether a holding was necessary to the decision in some strict logical sense, but also whether the en banc court was exercising some loosely defined "supervisory power" over three-judge panels, or over discrete issues "vital" to the circuit. Judge Tashima's Concurrence at 903. These infinitely amorphous inquiries undermine the guidance litigants are entitled to expect from our en banc opinions. They demonstrate neatly why Judge Tashima's regime is wholly unworkable.
 
 
 51
 Fortunately, Judge Tashima's ruminations are only a historical curiosity, because my view that all legal questions presented to the court and expressly resolved by it are binding is now the law of the circuit. See Miranda B. v. Kitzhaber, 328 F.3d 1181, 1186 (9th Cir.2003) (per curiam) ("As we have noted before, `where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.'" (quoting Johnson, 256 F.3d at 914)).[1]
 
 
 
 Notes:
 
 
 [1]
 In discussingMiranda B., Judge Tashima adds yet another wrinkle to his hidebound theory. Tashima Concurrence at 903 n. 2. According to Judge Tashima, the portion of Miranda B. adopting my position in Johnson is itself dicta (and can be ignored) because Miranda B. failed to state explicitly it was relying on a concurrence rather than an opinion, though, such acknowledgment is implicit in its use of "noted," rather than "held." In any event, Miranda B. is an opinion and its ruling is no less binding because it didn't conform exactly to Judge Tashima's citation preferences. Judge Tashima's theory is now so riddled with lesions and encrustations we can never be quite sure which portions of our case law are holdings and which dicta, unless and until the Oracle at Pasadelphi tells us.
 
 
 
 52
 O'SCANNLAIN, Circuit Judge, with whom Circuit Judge TALLMAN joins, concurring in part:
 
 
 53
 While I concur in the outcome reached by the majority today, I write separately to note my firm conviction that such an outcome was reachable only by way of en banc review. Thus, I cannot join the majority's pronouncement in Part V.B, "Whether En Banc Review Was Required," implying as it does that the three-judge panel in this case was free to disregard prior Ninth Circuit precedent.
 
 
 54
 We took this case en banc to determine whether our court's holding in Babcock was still good law. We have properly concluded that it is not. I am as comfortable with this court's conclusion as I was uncomfortable when writing for the three-judge panel, see Miller, 292 F.3d at 990 ("Indeed, we are profoundly disturbed that persons acting in the name of the State of Nevada would place a known sexual predator into a home with two small children...") (emphasis in original), but my conviction as to the ultimate rectitude of each decision flows from the same source: the clear authority of the en banc court to do what three-judge panels normally cannot — namely, overrule prior decisions of three-judge panels.
 
 
 55
 I do not believe that the Supreme Court's intervening precedent — as set forth in cases such as Antoine and Kalina — had so clearly undermined Babcock as to allow a three-judge panel to overrule it. The en banc court, however, is unencumbered by any obligation to follow the decision of a three-judge panel, and therefore is free to do what, in my view, the panel could not. I agree that recent Supreme Court precedent indicates that Babcock's central holding had, at best, an uncertain future. Accordingly, I concur in all but Part V.B of the Court's opinion.
 
 TASHIMA, Circuit Judge, concurring:
 
 56
 I concur fully in Chief Judge Schroeder's opinion. I write separately only to explain why, in my judgment, Part V.B of the opinion, entitled "Whether En Banc Review Was Required," which, while technically dicta, is nonetheless authoritative and binding precedent for this circuit.
 
 
 57
 Part V.B's discussion of the three-judge panel's conclusion that it was bound by Babcock v. Tyler, 884 F.2d 497 (9th Cir. 1989), and its guidance for future panels similarly faced with circuit precedent that has been undercut by later Supreme Court case law is unnecessary to the decision of this case and is, therefore, dicta. See Best Life Assurance Co. v. Comm'r, 281 F.3d 828, 834 (9th Cir.2002) (defining dictum as "a statement `made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential ...'") (quoting Black's Law Dictionary 1100 (7th ed.1999)); Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1472 (9th Cir.1995) (holding that statements were dicta where they "were not necessary to the decision"); see also United States v. Johnson, 256 F.3d 895, 919-21 (9th Cir.2001) (en banc) (Tashima, J., concurring).
 
 
 58
 Part V.B's discussion is not necessary to the decision of this case because the original three-judge panel's opinion was withdrawn when rehearing en banc was granted. Miller v. Gammie, 309 F.3d 1209 (9th Cir.2002); see also Ninth Cir. Gen. Order 5.5(d) (providing that, if a case is taken en banc, "[t]he three-judge opinion shall not be cited as precedent"). "A court's decision to rehear a case en banc effectively means that the original three-judge panel never existed." Socop-Gonzalez v. INS, 272 F.3d 1176, 1187 n. 8 (9th Cir.2001) (en banc). "The en banc court does not review the original panel decision, nor does it overrule the original panel decision. Rather, the en banc court acts as if it were hearing the case on appeal for the first time." Id.
 
 
 59
 It is therefore clear that we need not address whether the three-judge panel's decision that it was bound by Babcock was correct in order to resolve this case. Similarly, the en banc court[1] need not address under what circumstances future three-judge panels would or would not be bound by Ninth Circuit precedent in order to decide this case. The only issue that it is necessary to decide in order to dispose of this case is whether Babcock remains good law. Thus, discussion of the binding effect of Ninth Circuit precedent on three-judge panels is, technically, dicta.[2]
 
 
 60
 Although dicta, however, the discussion in Part V.B is authoritative and binding because of the unique nature of the court sitting en banc. As the Supreme Court has noted:
 
 
 61
 The principal utility of determinations by the courts of appeals in banc is to enable the court to maintain its integrity as an institution by making it possible for a majority of its judges always to control and thereby to secure uniformity and continuity in its decisions, while enabling the court at the same time to follow the efficient and time-saving procedure of having panels of three judges hear and decide the vast majority of cases as to which no division exists within the court.
 
 
 62
 United States v. American-Foreign S.S. Corp., 363 U.S. 685, 689-90, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960) (quoting Albert B. Maris, Hearing and Rehearing Cases in Banc, 14 F.R.D. 91, 96 (1954)). The en banc court has the "power to `determine the major doctrinal trends of the future' for a particular Circuit...." Moody v. Albemarle Paper Co., 417 U.S. 622, 626, 94 S.Ct. 2513, 41 L.Ed.2d 358 (1974) (quoting American-Foreign S.S. Corp., 363 U.S. at 690, 80 S.Ct. 1336.) The court sitting en banc is "charged with the administration and development of the law of the circuit." American-Foreign S.S. Corp., 363 U.S. at 689, 80 S.Ct. 1336. It is this supervisory role of the en banc court that gives Part II's dicta the authority of law. Cf. United States v. Oshatz, 912 F.2d 534, 540-41 (2d Cir.1990) (holding that dicta in three-judge panel's opinion was binding precedent because it involved the court's supervisory authority over trial courts in that circuit); Johnson, 256 F.3d at 920 (leaving open the issue of "the force of dicta" when a court acts in its supervisory capacity).
 
 
 63
 Part V.B provides guidance to future panels which are faced with Ninth Circuit precedent whose reasoning may have been undermined by subsequent Supreme Court law. In providing such guidance, the en banc court properly ensures that future panels will act consistently and helps to secure uniformity and conformity in this circuit's decisions. Without this supervisory power of the en banc court, our circuit's ability to resolve questions or conflicts on issues regarding the binding effect of Ninth Circuit precedent on three-judge panels would be greatly hampered. Absent this supervisory power, the en banc court would never be able authoritatively to address the propriety of a three-judge panel's refusal to follow, or its conclusion that it was bound to follow, Ninth Circuit precedent because the three-judge panel's original opinion would be withdrawn and discussion of those issues would be unnecessary to the decision of the case. Without the guidance of the en banc court, it is likely that conflicts and ambiguity in the case law surrounding this area would arise and persist.
 
 
 64
 The rationale articulated above is consistent with the past practice of our court sitting en banc of providing guidance to three-judge panels on important issues dealing with Ninth Circuit precedent, even if that guidance was not necessary for the determination of the case. See United States v. Hardesty, 977 F.2d 1347, 1348 (9th Cir.1992) (en banc) (clarifying procedure for future three-judge panels regarding conflicting Ninth Circuit precedent); Mesa Verde Constr. Co. v. N. Cal. Dist. Council of Laborers, 861 F.2d 1124, 1135-37 (9th Cir.1988) (en banc) (providing rule for future three-judge panels regarding Ninth Circuit precedent and the National Labor Relations Act); Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir.1987) (en banc) (establishing procedure for future three-judge panels regarding conflicting Ninth Circuit precedent).
 
 
 65
 When, as here, the guidance of the en banc court is necessary to ensure that future three-judge panels will act consistently regarding the binding effect of precedent, it is eminently appropriate for the en banc court to address matters that, while not necessary to the decision of the case, are vital to "the administration and development of the law of the circuit." American-Foreign S.S. Corp., 363 U.S. at 689, 80 S.Ct. 1336. In such instances, when the en banc court exercises its supervisory authority over three-judge panels, its decisions should be recognized as authoritative and binding.
 
 
 
 Notes:
 
 
 [1]
 Pursuant to the authority of Pub.L. No. 95-486, § 6, 92 Stat. 633, we have decided that the powers of the en banc court shall be exercised by a panel of 11 judgesSee Ninth Cir. R. 35-3. Nonetheless, as the statute makes clear, the 11 judge panel performs the "en banc function" of the court.
 
 
 [2]
 Although he makes no straightforward, categorical statement saying so, Judge Kozinski apparently believes that Part V.B of the court's opinion is not dicta. He citesMiranda B. v. Kitzhaber, 328 F.3d 1181, 1186 (9th Cir.2003) (per curiam), for the proposition that his concurring views in Johnson, 256 F.3d at 914, "is now the law of the circuit." It is true that Miranda B. appears to treat the portion of Judge Kozinski's concurrence which it quotes as controlling; it is equally true, however, that it was obviously proceeding on a mistaken assumption. Miranda B. refers to the statement quoted as the statement of the court—"As we have noted," (emphasis added), and in its citation, does not indicate that the statement is from that part of a concurring opinion, Part III.B, in which only three other judges on the 11-judge en banc panel joined. The Miranda B. per curiam panel was either unaware of that fact or chose to ignore it. Thus, Judge Kozinski's assertion that "my view ... is now the law of the circuit," is as expansive and as illsupported as his view of what constitutes dicta.