**George DOE, individually and as Guardian Ad Litem; Lacey Doe, a minor, Plaintiffs–Appellants,**

v.

**Betsey Warren LEBBOS; Lisvet Carrillo–Herrera; Aida Madeline Lebbos; Aida Lebbos Trust; County of Santa Clara; Santa Clara County Department of Social Services; Santa Clara County Child Protective Services, Defendants–Appellees.**

No. 02–16326.

United States Court of Appeals, Ninth Circuit.

Submitted March 11, 2003.*

Filed Nov. 4, 2003.

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Robert R. Powell, Law Offices of Robert R. Powell, San Jose, CA, for the plaintiffs-appellants.

Ann Miller Ravel, County Counsel, Winifred Botha, Lead Deputy County Counsel, Office of the County Counsel, San Jose, CA, for the defendants-appellees.

RYMER, KLEINFELD, and PAEZ, Circuit Judges.

Opinion by Judge PAEZ; Dissent by Judge KLEINFELD.

### OPINION

PAEZ, Circuit Judge:

George and Lacey Doe (the "Does") appeal from the district court's summary judgment on their 42 U.S.C. § 1983 claims in favor of Lisvet Carrillo–Herrera ("Herrera"), a county social worker, and the County of Santa Clara, the Santa Clara County Department of Social Services, and Santa Clara County Protective Services (together the "County"). The Does contend that Herrera and the County violated their constitutional rights by removing Lacey, a four-year-old girl, from George's custody, inadequately investigating allegations that George abused and neglected Lacey, fabricating evidence in support of the dependency petitions they filed in dependency court, and referring Lacey for a

sexual abuse examination without parental consent or a court order. The district court granted absolute immunity to Herrera, reasoning that her actions were part of the initiation and pursuit of child dependency proceedings for which social workers are entitled to absolute immunity. The court also concluded that there was no basis for *Monell* liability against the County.

We agree with the district court that the Does' *Monell* claim against the County must fail because there was no evidence that Herrera was a final decisionmaker for the County, that the County failed adequately to train its social workers, or that the County deliberately deprived the Does of their constitutional rights. We also agree with the district court that Herrera is entitled to immunity for her actions, but we disagree that she is entitled to absolute immunity across the board. Instead, we hold that Herrera's actions in allegedly failing to investigate adequately the allegations of abuse and neglect against George and in allegedly fabricating evidence in the dependency petitions she prepared for the court were part of the initiation and pursuit of child dependency proceedings, for which Herrera was entitled to absolute immunity. She is entitled only to qualified immunity, however, for her actions in maintaining Lacey outside of George's custody pending the November 5, 1999, detention hearing and in referring Lacey for a sexual abuse examination without parental consent or a court order. In light of our disposition of the immunity issue, we affirm the district court's summary judgment in favor of Herrera and the County.

1. Robin Doe died in a car accident on June 20, 1999. She did not have custody of or contact with Lacey for several years prior to her death due to a substance abuse problem.

## FACTUAL BACKGROUND

Lacey Doe is the four-year-old daughter of George Doe and Robin Doe.[1] On November 2, 1999, the San Jose Police Department detained Lacey and placed her in a children's shelter on the basis of allegations made by Betsey Lebbos ("Lebbos")[2] —an acquaintance of George's with whom he and Lacey lived for approximately one week after they moved to San Jose, California, from Miami, Florida—that, among other things, George had been drunk while caring for Lacey, had generally neglected her (i.e., failed to provide her with adequate food, shelter, and medical care), and that Lacey complained of vaginal pain and discharge.

On November 4, 1999, Herrera, a county social worker, was assigned to Lacey's case. With Herrera's assistance, Santa Clara County Social Services prepared a juvenile dependency petition, pursuant to California Welfare & Institutions Code section 300, in preparation for Lacey's detention hearing the following day. The report included failure to protect and sexual abuse allegations based in part (1) on evidence of general neglect as reported by the San Jose Police Department, (2) on George's alcohol problem and his failure to provide appropriate care when under the influence of alcohol, (3) on inconsistent statements made by George and Lacey's pediatrician regarding whether Lacey received medical treatment for a urinary tract infection, (4) on Lacey's complaints of vaginal pain and discharge (which appeared to be untreated), (5) on information that Lacey had redness around her vaginal area for which there was no reasonable explanation, (6) on reports that Lacey pre-

2. The relationship between George and Lebbos was troubled at best. There are many facts in the record about their tumultuous relationship that we do not recount here because they are not relevant to this appeal.

viously had two yeast infections, and (7) on a prior complaint against George in Santa Cruz County alleging that he sexually abused one of his other daughters.[3]

The dependency court held a detention hearing on November 5, 1999. At the hearing, the judge explicitly asked the County's attorney "if Lacey [was] getting some physical treatment at the shelter for her vaginal infection." The attorney responded that she would contact Herrera and check into treatment for Lacey. The judge then commented, "All right. Because that's very important because she has been complaining that it's painful." At the conclusion of the hearing, the judge decided that "on the face of the [dependency] petition a showing has been made that [Lacey] comes within section 300." The judge therefore detained Lacey and placed her under the supervision of the Department of Family and Children's Services. She also granted George supervised visitation rights.

Due in significant part to the judge's inquiry about Lacey's condition, as well as evidence of sexual abuse against Lacey, Herrera referred Lacey on November 10, 1999, to the Santa Clara Valley Medical Center, Center for Child Protection, for a sexual abuse examination. She did not have parental consent or a formal court order authorizing the examination. Mary Ritter, a certified physician's assistant, performed a physical examination, including a Sexual Assault Response Team ("SART") examination,[4] on Lacey to determine whether she had a vaginal infection and whether there were signs of sexual abuse. Ritter found "[n]o definite evidence of penetrating trauma," but concluded that the "absence of definite physical evidence of penetrating trauma by no means rules out the possibility of prior sexual contact."

The dependency court held a contested jurisdictional hearing on February 28, 2000.[5] George admitted the allegation of neglect, which was based on his alcohol use, and knowingly and intentionally waived his right to a trial. The judge then declared Lacey a dependent of the court and ordered George to participate in a family reunification plan. Lacey remained out of George's custody until May 15, 2001, when George completed the family reunification services.

After Lacey was once again in his custody, George filed suit in California Superior Court, on behalf of himself and Lacey, against the County, Herrera, and Lebbos. In his amended complaint, filed on November 9, 2000, he alleged nine state causes of action[6] and one federal cause of action[7],

---

3. On December 6, 1999, Herrera learned that this complaint was unfounded.

4. Ritter stated in her declaration: "Whenever a minor as young as Lacey Doe (i.e., a four year-old) is brought to me with complaints that may be symptomatic of a vaginal infection, I always perform a SART examination, regardless of whether the complaints indicative of a vaginal infection are accompanied by allegations of sexual abuse or molestation."

5. Before this hearing, Herrera twice amended the dependency petition she filed with the court to reflect new information she gathered upon further investigation into Lacey's case. The second amended petition was before the court at the February 28 hearing. The parties stipulated at the hearing that the only allegation the court should consider in deciding proper custody for Lacey was whether George "has a problem with alcohol which periodically renders him incapable of caring for [Lacey]."

6. The nine state causes of action were: intentional infliction of emotional distress, invasion of privacy, intentional interference with parent-child relations, libel, slander per se, fraud, violation of California Penal Code § 11172, unlawful eviction/forcible detainer, and civil conspiracy.

7. George alleged, pursuant to 42 U.S.C. § 1983, that the defendants violated Lacey's

all related to the removal of Lacey from his care and custody. The defendants removed the action to federal court on December 20, 2000.

On April 12, 2002, the district court granted summary judgment in favor of the County and Herrera on the Does' § 1983 claim. The court reasoned that Herrera was entitled to absolute immunity because her actions involved the initiation and pursuit of child dependency proceedings and that the Does had not provided a basis for *Monell* liability against the County. In addition, the court held that the Does' § 1983 claim was barred by the *Rooker–Feldman* doctrine. The judge also ordered the parties to show cause why he should not issue partial summary judgment in favor of Lebbos and why the case should not be remanded to state court for lack of federal jurisdiction in the event he entered partial summary judgment in favor of Lebbos.

On May 23, 2002, the district court granted summary judgment in favor of Lebbos on the Does' § 1983 claim because the Does failed to present any facts showing that Lebbos was acting in the capacity of a state actor. In addition, the judge remanded the state claims to state court because there were no remaining federal claims before the court.

The Does appeal from the district court's summary judgment in favor of Herrera and the County.[8]

## STANDARD OF REVIEW

■ We review *de novo* the district court's summary judgment. *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106 (9th Cir.2001). Whether Herrera is enti-

tled to immunity also is a question of law that we review *de novo*. *See id.*

## DISCUSSION

### I.

■ We address first whether the district court properly concluded that Herrera was entitled to absolute immunity for her actions in detaining Lacey prior to the initiation of child dependency proceedings, investigating the allegations of abuse and neglect and presenting evidence to the dependency court, and referring Lacey for a sexual abuse examination without a court order or parental consent. In making this determination, we apply a "functional approach." *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir.2003) (en banc). That is, we look at the "nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269, 113 S.Ct. 2606. State actors, including social workers, who perform functions that are "critical to the judicial process itself" are entitled to absolute immunity. *Miller*, 335 F.3d at 896 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). "Beyond those functions historically recognized as absolutely immune at common law, qualified and only qualified immunity exists." *Id.* at 897.

We conclude that Herrera is entitled to absolute immunity for her actions in investigating and presenting evidence to the dependency court and that she is entitled to qualified immunity for her other challenged actions.

Fourth Amendment rights and her right to privacy in her body, his right to rear, guide, and protect his family, and both his and Lacey's right to be free from unwarranted gov-

ernmental intrusion into their family and their right to privacy in their family relations.

8. The Does do not appeal the district court's summary judgment in favor of Lebbos.

## A.

■ The Does contend that Herrera both failed to investigate possible exculpatory evidence and fabricated evidence in the dependency petitions she submitted to the dependency court. Herrera, however, engaged in these actions as part of her initiation and pursuit of child dependency proceedings—she filed a dependency petition in state court on November 4, 1999, and dependency proceedings were held on November 5, 1999. Herrera's actions therefore had the "requisite connection to the judicial process" to be protected by absolute immunity. *Miller*, 335 F.3d at 896.

Indeed, in *Meyers v. Contra Costa County Department of Social Services*, 812 F.2d 1154, 1157 (9th Cir.1987), we recognized that "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *See also Imbler*, 424 U.S. at 416, 431 & n. 34, 96 S.Ct. 984 (holding that prosecutors are entitled to absolute immunity "in initiating a prosecution and in presenting the State's case," even where the prosecutor willfully used perjured testimony and willfully suppressed exculpatory information at trial); *Miller*, 335 F.3d at 898; *Mabe*, 237 F.3d at 1109 (holding, where there were allegations that social workers did not conduct their investigation properly and submitted false evidence during juvenile court proceedings, that the social workers were entitled to absolute immunity because their actions were part of the initiation and pursuit of dependency proceedings).

## B.

■ We next address Herrera's actions in detaining Lacey prior to the child dependency proceedings and referring Lacey for a medical sexual abuse examination without a court order or parental consent. Under *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), we must ask whether, viewed in the light most favorable to the Does, the facts alleged show that Herrera's actions violated a constitutional right. If they did, then we next must ask whether the constitutional right was "clearly established" such that it would have been clear to a reasonable social worker in Herrera's position that her conduct was unlawful. *Id.* at 201–02, 121 S.Ct. 2151. This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Id.* at 201, 121 S.Ct. 2151.

### 1. Detention of Lacey

The Does contend that Herrera violated their right to family privacy, George's right to raise Lacey without governmental interference, and Lacey's Fourth Amendment rights by detaining Lacey prior to the initiation of dependency proceedings.[9] The San Jose Police Department detained Lacey and placed her in a children's shelter on November 2. Herrera was not involved in any way with this initial detention. *Cf. Mabe*, 237 F.3d at 1105 (police officer *and* social worker removed child

---

**9.** In *Wallis v. Spencer*, 202 F.3d 1126, 1137 (9th Cir.2000) (as amended), we addressed parents' and children's claims that the children in that case unlawfully were seized and removed from their parents' custody. We recognized that the "claims of the parents in this regard should properly be assessed under the Fourteenth Amendment standard for interference with the right to family associa-

tion." *Id.* at 1137 n. 8. Moreover, "[b]ecause only the children were subjected to a seizure, their claims should properly be assessed under the Fourth Amendment." *Id.* Because we applied the same legal standard in evaluating Fourth and Fourteenth Amendment claims, we analyzed the parents' and the children's claims together in *Wallis*. *Id.* We do the same here.

from her home without a warrant). The Does argue that Herrera violated their constitutional rights by maintaining Lacey in protective custody between the time of her initial detention by the San Jose Police Department on November 2 and the time of the detention hearing on November 5.

■ We made clear in *Mabe* that the "constitutional right of parents and children to live together without governmental interference is clearly established." 237 F.3d at 1107; *see also Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir.1997). "The Fourth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe*, 237 F.3d at 1107; *see also Wallis*, 202 F.3d at 1138 ("Officials may remove a child from the custody of [his or her] parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."). We must determine whether Herrera's action in maintaining Lacey in temporary protective custody pending her detention hearing violated the Does' constitutional rights. We conclude that it did not.

Herrera had reasonable cause to believe that Lacey was neglected or abused and therefore in imminent danger.[10] Indeed, in the initial dependency petition she submitted to the court, Herrera recommended continued detention for Lacey. She found that "[t]here is substantial danger to the physical health of the minor or the minor is suffering from severe emotional damage, and there are no reasonable means by which the minor's physical or emotional

health may be protected without removing the minor from the parent's or guardian's physical custody." She based this finding in part on the redness observed around Lacey's vaginal area, Lacey's complaints of vaginal pain and her vaginal discharge, and George's alleged alcohol abuse and general neglect of Lacey.

Lacey's case qualified as an "emergency" situation. Under our precedent, Herrera therefore did not violate the Does' constitutional right to family privacy, George's right to family association, or Lacey's Fourth Amendment rights by detaining Lacey until the November 5 hearing. *See Wallis*, 202 F.3d at 1138; *Ram*, 118 F.3d at 1311 ("A state official cannot remove children from their parents *unless* the official has a reasonable belief that the children are in imminent danger.") (emphasis added); *see also* Cal. Welf. & Inst. Code § 305(a) (requiring that a peace officer have "reasonable cause" for believing that a minor has been abused or neglected in order to take the minor into temporary custody); *id.* § 328 (stating that a social worker who has cause to believe that a child has been physically or sexually abused or neglected "shall immediately make any investigation he or she deems necessary to determine whether child welfare services should be offered to the family and whether proceedings in the juvenile court should be commenced").

In addition, Herrera complied with relevant California law regarding the removal and detention of children when there are allegations of abuse or neglect. Under California Welfare & Institutions Code section 306(a)(1), a social worker, like Herrera, in a county welfare department may "[r]eceive and maintain, pending in-

10. The dependency court judge noted at Lacey's November 5 detention hearing that "the lack of effort to maintain the child in the home was reasonable due to the emergency nature of the removal."

vestigation, temporary custody of a minor who is described in section 300, and who has been delivered by a peace officer." When a peace officer, such as the San Jose police officers here, places a minor in protective custody, however, "such minor shall be released within 48 hours after having been taken into custody, ... *unless within said period of time a petition to declare [her] a dependent child has been filed.* ..." Cal. Welf. & Inst.Code § 313(a) (emphasis added). Herrera filed a dependency petition on November 4, within 48 hours of the police detaining Lacey. *See Jenkins v. County of Orange,* 212 Cal.App.3d 278, 285, 260 Cal.Rptr. 645 (1989) (holding that social worker's detention of child between the time the child initially was taken into custody and the time of the detention hearing "was under legal authority" because the social worker filed a dependency petition within 48 hours after the child was taken into custody, as required by California Welfare & Institutions Code § 313). She also informed George of the allegations against him and provided him with notice of the detention hearing, which he attended. *See* Cal. Welf. & Inst.Code §§ 302(b) & 307.4(a) (requiring that parents be notified of all proceedings involving their child and of their procedural rights).

We therefore conclude, under the first *Saucier* prong, that the Does have not alleged a constitutional violation of their right to family privacy, George's Fourteenth Amendment right to family association, or Lacey's Fourth Amendment rights. Herrera maintained Lacey in temporary protective custody for the statutorily prescribed amount of time, had reasonable cause to believe that Lacey had been ne-

glected or abused, and provided George with notice of the allegations against him and of the November 5 hearing. As a result, Herrera is entitled to qualified immunity with respect to this claim.

2. Referral for a Medical Examination

The Does contend that Herrera violated Lacey's right to privacy and George's right to guide, rear, and protect Lacey by referring Lacey for an intrusive sexual abuse examination without parental consent or a court order. We conclude that, although the Does have alleged a violation of a constitutional right, Herrera nonetheless is entitled to qualified immunity because it would not have been clear to a reasonable social worker in Herrera's position that her action was unlawful. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 ("If the law did not put the [social worker] on notice that [her] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."). We note that the parties did not brief the issue of whether Herrera's alleged actions, if proven, violated a constitutional right. We are obligated under *Saucier,* however, to address this issue at the outset of our qualified immunity analysis.

In *Wallis,* 202 F.3d at 1141,[11] we recognized that the "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." We agreed with the Second Circuit that the "Constitution assures parents that, in the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials

---

11. *Wallis* was the law of the circuit at the time Herrera referred Lacey for a sexual abuse examination. *See Wallis v. Spencer,* 193 F.3d 1054 (9th Cir.1999). We refer, how-

ever, to the amended version of *Wallis,* which did not alter the reasoning in our original opinion.

unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." 202 F.3d at 1141 (quoting *van Emrik v. Chemung County Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir.1990)) (internal quotation marks omitted; alteration in original). We recognized only two exceptions to the constitutional requirements of parental consent or a court order: "a reasonable concern that material physical evidence might dissipate" or "that some urgent medical problem exists requiring immediate attention." *Id.*

■ Herrera did not obtain parental consent or a court order before referring Lacey for a medical sexual abuse examination. Indeed, George claims that he was not aware that Lacey was to be examined. In addition, there was no risk here of losing crucial evidence and, although it needed promptly to be treated, Lacey's medical condition was not an "urgent" problem requiring "immediate attention." We therefore hold, consistent with our reasoning in *Wallis*, that, on the Does' version of the facts, Herrera violated the Does' constitutional rights to family association and procedural due process.[12] The Does adequately have alleged a constitutional violation under the first *Saucier* prong.

■ Our inquiry, however, does not end here. We next must determine whether the constitutional rights at issue were "clearly established" such that it would have been clear to a reasonable social worker in Herrera's position that her conduct was unlawful. *See Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. *Saucier* makes clear that "[i]f the [social worker's] mistake as to what the law requires is reasonable, ... the [social worker] is entitled to the immunity defense." *Id.* at 205, 121 S.Ct. 2151. Indeed, the Supreme Court cautioned against the use of 20/20 hindsight "in favor of deference to the judgment of reasonable [social workers] on the scene." *Id.* We conclude that a reasonable social worker in Herrera's position would have believed that she had an appropriate court order authorizing the examination and that her conduct was lawful. Herrera therefore is entitled to qualified immunity.

The dissent argues that granting qualified immunity to Herrera does not comport with *Wallis* because Herrera did not have a formal court order (although she had time to acquire one) authorizing a sexual abuse examination for Lacey. We disagree. Under the unique facts of this case, Herrera reasonably could have believed that she had the requisite court order authorizing the examination. Moreover, *Wallis* is distinguishable from this case.

The following exchange occurred between the judge and the County's attorney, Ms. Warsaw,[13] at Lacey's November 5 detention hearing:

> Court: Miss Warsaw, do you know if Lacey is getting some physical

---

12. We note that nowhere in their brief do the County defendants argue that Herrera did not violate the Does' constitutional rights in referring Lacey for a sexual abuse examination. The County argues that the examination was medically necessary due to Lacey's complaints about pain and discharge and that Herrera referred Lacey to the Santa Clara Valley Medical Center for purely medical rea- sons. We must view the facts in the light most favorable to the Does, however, who contend that Herrera referred Lacey specifically for a sexual abuse examination and not for medical reasons.

13. Herrera was not present at the November 5 hearing.

treatment at the shelter for her vaginal infection?

Ms. Warsaw: I don't know, Your Honor. I did intend to ask the social worker that this morning. She was not here, and I did not get the opportunity to call her, but I will be checking into that.

Court: All right. Because that's very important because she has been complaining that it's painful.

Ms. Warsaw: Yes.

Herrera stated in her declaration that she referred Lacey to the Santa Clara Valley Medical Center "based on the court's inquiry at the hearing on November 5, 1999, as to whether Lacey Doe was receiving medical treatment for her vaginal infection." It is true, as the dissent points out, that Herrera did not have a formal, written order authorizing Lacey's sexual abuse examination, but an objective social worker in Herrera's position, who was told by the County's attorney that the dependency judge specifically inquired about treatment for Lacey, reasonably could have believed that she had the necessary authorization from the court to refer Lacey for an examination. She therefore would not have believed that it was necessary to obtain a written order from the court in the days prior to the examination. This is especially true in light of the fact that Lacey was declared a dependent of the court and the court was responsible for ensuring that Lacey received appropriate care. We agree with the dissent that Herrera's be-

lief was mistaken in light of *Wallis*, but we conclude that the mistake was a reasonable one because, under the unique circumstances here, it would not have been clear to a reasonable social worker in Herrera's position that her actions were unlawful.[14] *See Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151.

The dissent relies exclusively on *Wallis*, but *Wallis* is distinguishable from the facts in this case. In *Wallis*, a police detective referred the children for sexual abuse examinations without parental consent or a court order, 202 F.3d at 1134–35, even though there were *no* allegations of sexual abuse against the children's parents, *id.* at 1143 (noting "the absence of any individualized suspicion of sexual abuse"). At the time of the examinations, a dependency petition had not been filed with the court and the children had not yet been declared dependents or placed in protective custody. *Id.* at 1134–35. In contrast, at the time Herrera referred Lacey for an examination, she had filed a dependency petition with the court that included sexual abuse allegations and the court had declared Lacey a dependent. The court was responsible for monitoring Lacey's care and specifically inquired about treatment for Lacey's vaginal problems. Moreover, Lacey showed signs of needing medical attention—she complained of vaginal pain, experienced vaginal discharge, previously had had two yeast infections (which are not common in girls her age), and had unexplained redness around her vaginal area.[15]

---

**14.** We also note that California law today and in force at the time Herrera referred Lacey for the sexual abuse examination permits local child welfare departments to seek physical examinations of children when there are allegations of sexual abuse. *See* Cal. Welf. & Inst.Code § 324.5. It is unclear from the record whether Herrera referred Lacey for an examination on the basis of § 324.5, but we must assume that she was aware of this law, just as we must assume that she was aware of

*Wallis*, at the time she ordered the examination.

**15.** George told Herrera that the redness around Lacey's vaginal area probably resulted from a medical procedure performed on Lacey on October 26, 1999, in Florida, to test her for a urinary tract infection. When Herrera initially contacted Lacey's pediatrician in Florida, however, the pediatrician denied having performed the procedure. At the time

*Cf. id.* at 1063 (referring children for an "*evidentiary* physical examination") (emphasis added). Herrera also had discovered a prior complaint against George in Santa Cruz County alleging that he sexually abused one of his other daughters.[16]

In sum, we conclude that, even though Herrera made a mistake by referring Lacey for a sexual abuse examination without George's consent or a formal court order, her mistake was a reasonable one under all the circumstances of this case, and she is entitled to qualified immunity with respect to this claim.

## II.

The Does also seek to hold the County liable for violating their constitutional rights. The district court concluded that there was no basis for *Monell*[17] liability against the County, and we affirm.

The Does base their *Monell* claim on a statement made by Mary Ritter, the physician's assistant who performed the SART exam on Lacey, regarding her customary practice of performing SART examinations, irregardless of allegations of sexual abuse, on females as young as Lacey with complaints symptomatic of vaginal infections. According to the Does, because Herrera *directed* Ritter to perform the SART examination, she was a county decisionmaker and Ritter's comment alone

provided a basis for their *Monell* claim against the County. We disagree.

The Does provide no evidence that Herrera was a final decisionmaker or that she acted with deliberate indifference to the Does' constitutional rights. *See Bd. of County Comm'r v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Christie v. Iopa,* 176 F.3d 1231, 1235–40 (9th Cir.1999). They also did not present sufficient evidence to show that the County failed adequately to train its social workers or, had the County failed to train, that this failure deliberately caused a deprivation of their constitutional rights. *See City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197 (holding that failure to train may serve as the basis for section 1983 liability "[o]nly where [it] reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior case law"). We therefore hold that the district court correctly granted summary judgment against the Does on their *Monell* claim against the County.

## CONCLUSION

We affirm the district court's summary judgment in favor of Herrera and the County. In light of our disposition, we need not reach the County's alternative *Rooker–Feldman*[18] argument.

AFFIRMED.

---

16. Herrera referred Lacey for a sexual abuse examination, it appears that she therefore had received conflicting information about whether a procedure had in fact been conducted on Lacey and could have caused Lacey's redness. Lacey's pediatrician ultimately remembered that Lacey had undergone a medical procedure on October 26 and that there was no finding of a urinary infection. We are concerned, however, only with what Herrera knew at the time she referred Lacey for the sexual abuse examination.

16. George argues that the complaints were unsubstantiated and therefore should have been stricken from Herrera's dependency petition. The record indicates, however, that Herrera did not discover that the information was unfounded until December 6, 1999, *after* she already had referred Lacey for the sexual abuse examination.

17. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

18. *See D.C. Ct. of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206

KLEINFELD, Circuit Judge, dissenting in part:

I concur in all of the majority opinion except part I(B)(2), qualified immunity for referring the child for an investigatory examination of her private parts. From that part, I respectfully dissent.

I concur in the majority's conclusion that "on the Does' version of the facts, Herrera violated the Does' constitutional rights to family association and procedural due process."[1] This is so, we are agreed, because a social worker needs parental consent or a court order to obtain an investigative medical examination of the child, in the absence of some urgent medical problem requiring immediate attention or a reasonable concern that material physical evidence may otherwise dissipate.[2] The majority bases qualified immunity on its erroneous conclusion that "Herrera reasonably could have believed that she had the requisite court order authorizing the examination."[3]

That conclusion runs contrary to what Herrera herself said. Herrera testified in her March 1, 2002 deposition that she "did not" obtain a court order before sending the little girl for an examination of her private parts:

Q. So you requested a sexual abuse exam of this child?

A. Yes.

Q. Did you obtain a court order before you did that?

A. No, I did not.[4]

Herrera prepared written recommendations for other orders, and the judge at the dependency hearing signed orders dealing with other matters. Herrera never submitted, and the judge never signed, an order for the examination Herrera had forced upon the child. In fact, Herrera did not claim in her declaration, any more than in her deposition, that she thought the judge had ordered an investigatory medical examination. She referred to the judge's actual orders and then, in a separate paragraph, she referred to the judge's remarks, not as an order, but rather as an "inquiry ... as to whether Lacey Doe was receiving medical treatment for her vaginal infection."[5]

Could a reasonable social worker have believed that she was carrying out an order for a vaginal examination, even though this particular social worker did not so believe? The majority comes up with this on its own; the brief for the social worker and the county does not make this argument. And the argument seems quite a stretch on the facts of this case. The judge knew how to give orders, and distinguished her orders from her other remarks. Later in the same hearing, the judge said what orders she was making, and did not include an order for an examination. True, the social worker was not there (the agency's lawyer evidently expected her, responding to the judge's inquiry about "treatment ... for her vaginal infection" by saying, "I did intend to ask the social worker that this morning. She was not here, and I did not get the opportunity to call her....").[6] The majority creates and then indulges a speculation that, told of the judge's inquiry, the social

(1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

1. Maj. Op. at 829.

2. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir.2000).

3. Maj. Op. at 829.

4. E.R. at 319–20.

5. *Id.* at 49–50.

6. *Id.* at 99.

worker could have inferred that she had an order. That speculation is unsupported by any such claim from the social worker or the agency attorney at the hearing or in the brief. Also, between the time of the police report and the examination, this case was brought into court on another issue, so there was plenty of time to obtain judicial approval. Yet it was not sought.

Lacey never did get "treatment . . . for her vaginal infection," which the judge had inquired about. Fortunately, she did not have a vaginal infection—this was misinformation from Betsy Lebbos. In any event, the social worker did not send her to a doctor for treatment. The social worker sent her for a sex abuse examination by a physician's assistant, not for medical treatment by a medical doctor:

> Q. What did you make the arrangements for?
>
> A. I had a SART exam completed.
>
> Q. So you requested a sexual abuse exam of this child?
>
> A. Yes.[7]

The term "SART" means Sexual Assault Response Team. The physician's assistant's report likewise says that the referral was "for evaluation of concerns of possible child sexual abuse,"[8] not for diagnosis and treatment of a vaginal infection. The very long delay, from November 2, when the child was whisked away from her father with an allegation of vaginal infection, to November 10, when she was presented to the physician's assistant (five days after the judge's expressed concern for the child's health), is plainly inconsistent with any concern by the social worker for her health. The physician's assistant made the little girl display herself in "the supine frog leg position" and "the prone knee-chest position," and she took magnified photographs of the child's private parts. She found no evidence of penetration.[9]

Of course the *Wallis* rule would allow, and common sense would require, that the social worker send the little girl for a medical examination without awaiting a court order if there were an "urgent medical problem," such as to "require[ ] immediate attention."[10] In this case, there is no way that the social worker could be covered by that exception. The social worker did *not* treat Lacey as having an "urgent" problem requiring "immediate" attention. Lacey was not examined until November 10, eight days after the police report indicated an accusation of a vaginal infection, and five days after a judge specifically inquired about it. None of us would wait that long on our own "urgent medical problem[s]" requiring "immediate attention." Lacey's examination plainly did not satisfy this standard from *Wallis.*

Overzealousness by government agents taking children away from their parents can have (and in this case apparently did have) devastating consequences, consequences not ameliorated in the slightest by self-righteous confidence of government agents sure that they are doing good. We do children no good by overindulging government agents who take them away from their families with immunity beyond what the facts and the law justify. As we said in *Calabretta v. Floyd,* "[t]he government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in . . . the lawfully exercised authority of their parents."[11]

---

7. *Id.* at 319.

8. *Id.* at 119.

9. *Id.* at 119–20.

10. *Wallis,* 202 F.3d at 1141.

11. *Calabretta v. Floyd,* 189 F.3d 808, 820 (9th Cir.1999).

Lacey was taken away from her father on the basis of "lack of food, clothing, shelter and medical care inadequate," and an accusation of suspected sexual abuse.[12] These accusations came from Betsy Lebbos. Lebbos's written statement explained what she meant by lack of food: when she got fast food on the way home from shopping, "Lacey did not eat her hamburger or any food"; the next morning she refused to eat her cereal; her father said she would not eat fruits and vegetables.[13] The concern for lack of clothes was that Lacey arrived from Miami with only summer clothes, and Betsy Lebbos disapproved of her father's letting his child sleep in the same pair of pajamas every night.[14] The October 31 incident that triggered Lebbos's call to the state and all the subsequent events of this case was that Lebbos "purchased Lacey a beautiful $15.00 princess dress," yet her father took her from Lebbos's house and did not put her in her princess dress for Halloween.[15] According to the social-service intake form, Lebbos then held Lacey's father's things hostage to get custody of the little girl: "As per officer, Betsy Lebbos has appeared irate and irrational, saying she wouldn't give dad his clothes unless he gave child to her. Officer is concerned that Betsy Lebbos is attempting to gain custody of child."[16]

The agency screener characterized this supposedly neglected child, a few hours after being whisked away, as "friendly and cooperative.... She appeared to enjoy watching cartoons and playing with toys, exhibited curiosity about her surrounding.

She displayed no anxiety to be among strangers and ate a sandwich, chips and cookies hungrily."[17] Those who took Lacey away left behind her glasses. Her father brought them to court and asked that they be delivered to her. The bureaucracy, it appears, focused on her genitals, not on her eyes, despite her obvious amblyopia. The physician's assistant who did the sex abuse examination and photography likewise characterized Lacey upon arrival at her office as a "pleasant, cooperative preschool female in no acute distress," normal in height, weight, and other respects.[18]

After being bounced around in the agency and foster-parent bureaucracy for over a year, Lacey was quite a different little girl. She was "diagnosed with Post Traumatic Stress Disorder, hearing voices, and suicidal ideation."[19] She was put on antipsychotic medication. She had taken to smearing feces and to other abnormal and highly disruptive behavior. Though Lacey had somehow held her personality together through her mother's death, her father's lack of financial success, and the move back to California, what the county did to her to "protect" her apparently destroyed her. Something in this experience, perhaps being ripped away from her father for whom she consistently expressed love during the whole miserable period, perhaps having strangers strip her and search her heretofore private parts, perhaps being put with caretakers instead of her father, amounted to a trauma that was too much for her.

12. E.R. at 58.

13. *Id.* at 213.

14. *Id.* ("To make your daughter sleep in the same pair of pajamas every night is neglect.").

15. *Id.* at 217.

16. *Id.* at 207.

17. *Id.* at 227–28.

18. *Id.* at 120.

19. *Id.* at 107.

On these facts, the majority grants Herrera qualified immunity; it calls what she did a "reasonable" mistake. Instead, we should remember Justice Brandeis's warning and remand this case for trial:

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.[20]

---

**20.** *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).